UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHERMAN BROWN,                                    :

               Plaintiff,               :                06 Civ. 2235 (AJP)

       -against-                      :                **OPINION AND ORDER**

JANICE DeFRANK, et al.,                           :

            Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**ANDREW J. PECK, United States Magistrate Judge:**


          Pro se plaintiff Sherman Brown, a former inmate of the New York State Department

of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983, Title II of the

Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., Section 504 of the

Rehabilitation Act, 29 U.S.C. § 794, and the Eighth and Fourteenth Amendments, alleging violations

of his constitutional rights by various DOCS employees.  (Dkt. No. 3: Am. Compl. at 2.)  Brown

alleges that defendants:  (1) were deliberately indifferent toward his serious medical needs;

(2) retaliated against him; (3) discriminated against him; (4) ignored risks to his health and safety;

(5) intentionally submitted false official reports and/or tampered with medical records; (6) denied

and/or unreasonably delayed medical treatment and specialty care recommendations; and

(7) deprived him of a transporting medical service and a meaningful access permit that was afforded

to other prisoners similarly situated.  (Am. Compl. ¶ 4.)

Presently before the Court is defendants' motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. No. 24: Defs. Notice of Motion.)  Defendants move to dismiss on the grounds that:  (1) the Court lacks subject matter jurisdiction over Brown's claims for injunctive relief because he is no longer incarcerated in any DOCS facility (Dkt. No. 25: Defs. Br. at 4-5); (2) the Court lacks subject matter jurisdiction over Brown's claims against defendants in their official capacities (Defs. Br. at 6); (3) Brown's claims fail because he did not suffer from a sufficiently serious medical condition (Defs. Br. at 6-9); (4) Brown fails to state a claim under the ADA or Rehabilitation Act (Defs. Br. at 9-10); (5) Brown's claims against certain defendants fail for lack of their personal involvement (Defs. Br. at 10-14); and (6) defendants are entitled to qualified immunity (Defs. Br. at 14-16).

The parties have consented to the Court's decision of this case pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 30.)

For the reasons set forth below, defendants' motion to dismiss is GRANTED with respect to:  (1) Brown's § 1983 claims against defendants in their official capacity; (2) all of Brown's claims for injunctive relief; (3) Brown's § 1983 deliberate indifference to medical needs claims relating to his bunions; (4) Brown's § 1983 retaliation claims; and (5) Brown's ADA and Rehabilitation Act claims relating to his bunions.  Defendants' motion to dismiss is DENIED with respect to:  (1) Brown's § 1983 deliberate indifference to medical needs claims relating to his arthritic hip condition; (2) Brown's ADA and Rehabilitation Act claims relating to his arthritic hip condition; and (3) defendants' claim of qualified immunity.

## **FACTS**

The facts alleged in the amended complaint and the exhibits thereto (Dkt. No. 3), and in Brown's affidavit in opposition to defendants' motion to dismiss and the exhibits theretoto (Dkt. No. 29), are assumed to be true for purposes of this motion, and will be set forth herein without use of the preamble "Brown alleges."

Brown was incarcerated at Woodburne Correctional Facility ("Woodburne") at the time he filed his amended complaint (Dkt. No. 3: Am. Compl. at 2), but has since been released (Dkt. Nos. 7, 8, 9, 12).

## **The Defendants**

Defendant Janice DeFrank is a registered nurse at Woodburne whose responsibilities are to "(a) monitor inmate's physical signs & symptoms; (b) address inmates health problems & complaints; and (c) implement the nursing intervention parameters at said encounters, e.g., (d) make referrals for inmates to be seen by the facilities medical doctor's and (e) make referrals for inmates to be seen at the in house clinics, e.g., asthma clinic, podiatry clinic, blood pressure clinic etc." (Dkt. No. 3: Am. Compl. at 2-3.)

Defendant Denise F. Boyd is a nurse administrator at Woodburne and is responsible for "implementing and maintaining quality nursing practices within the facility . . . [i]ncluding all aspects of the nursing process, e.g., (a) screening direct health care services, and (b) taking analysis of all inmate's health problems." (Am. Compl. at 3.)

4

Defendant Dr. Frank Lancellotti is a facility physician at Woodburne and is responsible for providing "primary health care to inmate patients."  (Am. Compl. at 3.)

Defendant Dr. Mervat Makram is Woodburne's Facility Health Service Director and is "the medical authority at the facility functioning as the supervisor to all health unit staff and is responsible for all aspects of inmate health care services."  (Am. Compl. at 3.)

Defendant P.D. Early is a Corrections Captain at Woodburne and "exercises judgment on all special permits requiring security clearance at the facility."  (Am. Compl. at 3.)

Defendant Jean G. King is the Woodburne Deputy Superintendent for Programs and serves as the "designated individual who over sees compliance of reasonable accommodations for inmates with disabilities within the facility."  (Am. Compl. at 4.)

Defendant Raymond J. Cunningham is Woodburne's Superintendent and serves as "the chief administrative officer, who directs the work and defines the duties of all officers and subordinates of the facility."  (Am. Compl. at 4.)

Defendant Pedro Diaz is DOCS' Regional Health Service Administrator, whose "primary function is to promote constitutionally adequate health care; detect & resolve inmate's health care needs and/or problems within the facilities of this region . . . ; assist in decision making on health related activities; advise the Superintendent on health care policy; and monitor facility compliance with all facially valid health care directives & policies."  (Am. Compl. at 4, emphasis omitted.)

Defendant Jayne Molloy is DOCS' Senior Utilization Review Nurse, responsible for "contract[ing] hospitals for DOCS use for specialty care patients; mak[ing] referrals for inmates who have been clinical[ly] approved for outside specialty care treatment; organiz[ing] the use of, and allocat[ing] department funds for the specific purposes thereof."  (Am. Compl. at 4.)

Defendant Dr. Lester Wright is DOCS' Associate Commissioner and Chief Medical Officer, and "is the medical authority for DOCS and directly responsible for implementing constitutionally adequate medical practice throughout the department."  (Am. Compl. at 5.)

**Brown's Bunions and Osteoarthritis of the Right Hip**

Brown was diagnosed with "bilateral hallux valgus," commonly known as bunions in both feet, and degenerative osteoarthritis of the right hip.  (Dkt. No. 3: Am. Compl. ¶ 2 & Exs. A-2, B-1, B-7.)  Because of these conditions, Brown had "difficulties with activities of daily living, 'especially stair climbing,'" and needed to use a walking cane.  (Am. Compl. ¶ 2 & Exs. B-5, B-6, B-7, B-9, B-12.)

**2004 Medical Records and Grievances**

On August 27, 2004, Brown was diagnosed with "[m]oderate degenerative osteoarthritic changes of right hip."  (Am. Compl. ¶ 27 & Ex. B-1.)  An August 27, 2004 X-Ray Requisition and Report noted that Brown complained of pain in his right hip "since bike accident > 30 yrs ago."  (Am. Compl. Ex. B-1.)

On September 30, 2004, Brown went to sick call because he was experiencing bunion pain in his feet.  (Am. Compl. ¶ 9.)  Brown told defendant Nurse DeFrank about the pain he was

experiencing and requested a referral to a podiatrist and "medical boots." (Am. Compl. ¶ 9.) After examining his feet, Nurse DeFrank told Brown: "'nothing is wrong with your feet, you don't have bunions that's just the way your feet are. Besides there is nothing we can do because no foot doctor comes to Woodburne.'" (Am. Compl. ¶ 10.) After this meeting with Nurse DeFrank, Brown submitted a formal grievance seeking medical treatment. (Am. Compl. ¶ 12.)

On October 7, 2004, Brown went to sick call, again complaining of bunion pain in his feet. (Am. Compl. ¶ 13.) Non-defendant Nurse Reddish ordered x-rays to be taken of Brown's feet. (Am. Compl. ¶ 13.)

On October 13, 2004, the Inmate Grievance Review Committee ("IGRC") responded to Brown's grievance, stating: "Depending on X-ray results, grievant will be reviewed for further treatment. Grievant is advised to follow-up at sick-call for any future problems with his feet." (Am. Compl. ¶ 15 & Ex. A-1a.) Brown appealed this response to the Superintendent. (Am. Compl. ¶ 15 & Ex. A-1a.)

On October 14, 2004, Brown's x-ray report showed "[b]ilateral hallux valgus with angle 30 degrees bilaterally. Remainder studies both feet unremarkable." (Am. Compl. ¶ 16 & Ex. A-2.) On October 15, 2004, Brown wrote a letter to defendant Nurse Administrator Boyd complaining of continuing bunion pain in his feet. (Am. Compl. ¶ 17 & Ex. A-3.) Nurse Administrator Boyd did not respond to Brown's letter. (Am. Compl. ¶ 17.)

On October 22, 2004, Brown went to sick call and complained about the continuing bunion pain in his feet. (Am. Compl. ¶ 18.) Later that day, Brown received the Superintendent's

response to his grievance appeal.  (Am. Compl. ¶¶ 18-19 & Ex. A-4.)   The Superintendent responded:  "Grievant's medical care is proper and ongoing.  Treatment plan implemented and pending results of x-rays.  A new treatment regimen would be prescribed if necessary.  At present there is no medical indication that grievant should see a foot doctor.  Grievant is advised to follow the treatment plan provided."  (Am. Compl. ¶ 19 & Ex. A-4.)  Brown appealed this response to the Central Office Review Committee ("CORC").  (Am. Compl. ¶ 20 & Ex. A-4.)

On November 2, 2004, Brown met with defendant Dr. Makram and told her of the pain in his feet.  (Am. Compl. ¶ 103.)  Dr. Makram reviewed Brown's medical records, acknowledged the bunion diagnosis, and recommended that Brown get orthotics, "'providing approval of the Regional Medical Director.'"  (Am. Compl. ¶ 103.)

On November 10, 2004, the Central Office Review Committee upheld the Superintendent's decision: "Contrary to the grievant's assertions, CORC has not been presented with evidence of discrimination by medical staff.  The grievant is receiving necessary treatment and appropriate care."  (Am. Compl. ¶ 21 & Ex. A-5.)

Brown's foot condition became progressively worse over the next few months, causing him more pain and "emotional distress."  (Am. Compl. ¶ 23.)  On November 19, 2004, Brown's health record states that he received ibuprofen to take until a prescription was received. (Am. Compl. Ex. B-2.)

On November 29, 2004, Brown went to sick call to complain of pain in his right hip and in his feet.  (Am. Compl. ¶ 28 & Ex. B-2.)  Brown told defendant Nurse DeFrank about the pain

he was experiencing, and requested a referral to a medical doctor so that he could request first floor housing.  (Am. Compl. ¶ 30.)  Brown explained to Nurse DeFrank that first floor housing would help him avoid stair climbing and therefore reduce his "pain, stress and strain" on Brown's arthritic right hip and the bunions in his feet.  (Am. Compl. ¶ 31.)  Nurse DeFrank denied Brown's request to refer him to a medical doctor.  (Am. Compl. ¶ 32 & Ex. B-2.)  Brown asserts that Nurse DeFrank denied this request in retaliation for his earlier grievance against her.  (Am. Compl. ¶ 32.)  Brown asked Nurse DeFrank why she would not refer him to a medical doctor, and she said "'I . . . don't need a reason, I'm the nurse and you're . . . only an inmate.'"  (Am. Compl. ¶ 33.)  Brown suggested that Nurse DeFrank read his medical file, and Nurse DeFrank became "very 'repulsive' and 'obnoxious' and responded in a 'hostile tone of voice,' telling Plaintiff . . . 'listen inmate, don't tell me how to do my job.'"  (Am. Compl. ¶ 34.)  Brown explained to Nurse DeFrank that he experiences pain when walking up and down stairs and "pleaded" with her for the medical doctor referral so that he could request first floor housing.  (Am. Compl. ¶ 35.)  Nurse DeFrank replied "'I . . . don't feel you need to see the doctor, or be housed on the first (1st) floor just because your hip & feet are hurting, so I'm not referring you to the doctor.  You're not a baby, learn to deal with the pain.'"  (Am. Compl. ¶ 36.)  As Brown was on his way out, Nurse DeFrank said "'the only way you . . . will be moved down stairs to a first (1st) floor housing unit, is if your feet are amputated.'"  (Am. Compl. ¶ 37.)  Brown experienced a "significant degree of emotional distress" from this comment.  (Am. Compl. ¶ 37.)

On November 30, 2004, Brown submitted a formal grievance regarding Nurse DeFrank's comments.  (Am. Compl. ¶ 39.)  On December 3, 2004, Nurse DeFrank responded:

>Inmate Brown 02A5006 was seen by MD 11.2.04 for pain [in right] hip. He is going out for PT [physical therapy] and he is scheduled to see Podiatry. I did not tell Brown he did not have bunions, as I do not diagnose. Brown requested to see MD to lock on the lower level because his feet hurt.[] I did not feel as the sick call triage nurse [that] inmate Brown needs to see the doctor at this time. I did not tell Brown as he stated "his feet would have to be amputated to move to a flat gallery.["]

(Am. Compl. ¶ 39 & Ex. B-3.) By memo dated December 3, 2004, Nurse Administrator Boyd responded:

>The grievant's complaints have been investigated and found to be unvalidated.

>Grievant wants to lock on the flats [i.e., to house on the first floor]. He has no medical indication to lock on the flats. The grievant's medical record was reviewed by Dr. Makram after his sick call encounter. His pain medication was increased and an additional medical was added. The grievant should take his medications as ordered. Nurse DeFrank was not insensitive nor totally disregarded the grievant's medical concerns for a lock on flats permit. Grievant was never told by Ms. DeFrank that his feet would have to be amputated to move to a flat gallery. (See memo from Ms. DeFrank.)

>Regarding Action Requested:

>The grievant has an appointment to see the Podiatrist for his feet. He is currently seeing the Physical Therapist for his right hip pain. The grievant has reported to the Physical Therapist that he feels better especially after a PT session but still complains of right hip cracking and pain. This inmate must continue with his physical therapy and medications as ordered.

(Am. Compl. ¶ 40 & Ex. B-3a.) Brown disputes the statement in Nurse Administrator Boyd's memo that his medical record was reviewed by a doctor and that he has no medical indication to have first floor housing. (Am. Compl. at ¶ 40 n.3.)

On December 14, 2004, the IGRC responded to Brown's grievance, stating: "Grievant is advised to write facility MD about his medical concerns for a permit to lock on flats. In addition,

Committee recommends grievant be scheduled for an MD appt. to address his concerns for a flat medical permit.  Moreover, grievant is advised that grievance program is not an adversary process." (Am. Compl. ¶ 42 & Ex. B-4.)

On December 22, 2004, Brown was taken to Sullivan Correctional Facility ("Sullivan") for physical therapy.  (Am. Compl. ¶ 43.)  The physical therapist at Sullivan, non-defendant Mohed Botroth, filled out a Request and Report of Consultation which was reviewed by defendant Dr. Frank Lancelotti, the facility physician.  (Am. Compl. ¶ 43 & Ex. B-5.)  The Request and Report of Consultation noted that Brown "still feels pain, sudden sever[e] pain during walking or climbing stairs . . . pain radiates to medial side and lower back too . . . all movement with pain," and that Brown had a "limping gait."  (Am. Compl. ¶ 43 & Ex. B-5.)  Physical therapist Botroth also requested that the doctor check the procedure regarding a hot pack for Brown to use in his cell and also for getting an assistive device such as a cane or crutch to decrease the load on Brown's right hip.  (Am. Compl. ¶ 43 & Ex. B-5.)  The document noted that Brown requested an MRI or a referral to an orthopedist for more evaluation.  (Am. Compl. ¶ 43 & Ex. B-5.)

On December 23, 2004, Brown's hip condition "adversely progressed very rapidly" and he suffered pain during walking and climbing stairs.  (Am. Compl. ¶ 78.)  Brown was issued a walking cane and a temporary permit to use it from December 23, 2004 until March 15, 2005.  (Am. Compl. ¶ 78.)

On December 27, 2004, Brown again was taken to Sullivan for physical therapy.  (Am. Compl. ¶ 44.)  The physical therapist filled out another Request and Report of Consultation

during the physical therapy session, which was reviewed by Dr. Lancellotti.  (Am. Compl. ¶ 44 &

Ex. B-6.)  The physical therapist noted on the report that Brown "still feels pain and clicking in the

[right] hip during walking and climbing stairs.  Please check as the [patient] suffer[s] from climbing

stairs so lock on a lower gallery if it's possible."  (Am. Compl. ¶ 44 & Ex. B-6.)  Brown claims that

Dr. Lancellotti was deliberately indifferent to his serious medical needs because he "intentionally

ignored" the physical therapist's recommendation.  (Am. Compl. ¶ 45.)

Later on December 27, 2004, Brown received the Superintendent's response to his

grievance appeal concerning his request for first floor housing:

> Grievant's medical care is proper and ongoing.  Appointments are scheduled and
> medication has been prescribed.  Per review of medical chart by the Nurse
> Administrator, there is no medical indication that the grievant needs to lock on "flats"
> (first floor).
>
> As per the attending nurse, accusation made by grievant was totally refuted by staff
> member.

(Am. Compl. ¶ 46 & Ex. B-6a.)

On December 30, 2004, Brown asked Nurse Liciaga during sick call about the status

of his medical boots, and she noted in the record that Brown had been told on November 2, 2004 that

he would get medical boots.  (Am. Compl. ¶ 104 & Ex. E-1.)  She requested the boots and referred

Brown to orthopedics.  (Am. Compl. ¶ 104 & Ex. E-1.)

**2005 Medical Records and Grievances**

On January 13, 2005, Brown was taken to Coxsackie Correctional Facility ("Coxsackie") to be examined by non-defendant orthopedic specialist Dr. Rubinovich. (Am. Compl. ¶ 48.) Dr. Rubinovich wrote a letter to Dr. Lancellotti regarding Brown's condition, stating in part:

> [Brown] is a 45-year-old gentleman with 3 problems.  The first is Osteoarthritis of his Right Hip.  The second and third are Bilateral Bunions, which are quite painful.  In actuality, the Bunions are the things that bother Sherman [Brown] the most right now.  He has had these for quite some time and it is getting progressively worse.  He has trouble wearing shoes.  His hip has been going on for about 8 months now.  It is getting progressively worse.  The pain is in the groin and radiates down the leg, especially with walking and stairs.
>
> . . .
>
> Sherman [Brown] would like to start with his right foot.  My plan would be to do a Metatarsal Osteotomy for him.  This can be done as an outpatient at Alice Hyde.  We will eventually get to the left foot.  He feels he can live with his hip right now, but I think that at some point in the future, he is going to require a Total Hip Arthroplasty.  If we can get clearance for the right foot, I would appreciate it.

(Am. Compl. ¶ 48 & Ex. B-7.)  A notation dated January 28, 2005 at the bottom of the letter states: "Procedure under review."  (Am. Compl. Ex. B-7.)

On January 19, 2005, the CORC responded to Brown's grievance requesting first floor housing, stating:

> Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Health Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated.
>
> CORC notes that the grievant was seen by the physician after his sick call encounter.  CORC also notes that there is currently no medical necessity for the grievant to lock on flats.  CORC further notes that the grievant was provided with medication and

> referrals for physical therapy and podiatry were posted.  Contrary to the grievant's assertions, CORC has not been provided with sufficient evidence to substantiate that the Nurse in question was insensitive toward the grievant and his needs.  CORC advises the grievant to continue to address his health care concerns via sick call.

(Am. Compl. ¶ 50 & Ex. B-8.)

On January 31, 2005, Brown met with defendant Dr. Mervat Makram, the Woodburne health service director.  (Am. Compl. ¶ 60.)  Brown's health record from that meeting notes that Dr. Makram spoke with Jayne Molloy, from DOCS "central office," and that Brown would be referred to podiatry at Coxsackie for bunion surgery.  (Am. Compl. ¶¶ 60-63 & Ex. C-1.)  The record also notes that the previously scheduled orthopedic procedure to correct Brown's bunions at Hyde Hospital was cancelled; Brown was told that was because Hyde Hospital was too far away from Woodburne.  (Am. Compl. ¶¶ 60-63 & Ex. C-1.)

On February 15, 2005, while Brown was going to get his medication, his hip gave out on him, causing him to fall down the staircase from the second floor landing of the B-2 housing unit.  (Am. Compl. ¶ 51.)  Brown slammed into the wall at the bottom of the staircase, aggravating his hip condition.  (Am. Compl. ¶ 51.)  Brown was in pain and was transported to the medical unit on a stretcher.  (Am. Compl. ¶ 52 & Ex. B-9.)  The medical staff took x-rays of Brown's right hip, issued him crutches and ibuprofen for pain, and instructed him to be on bed rest to recuperate from the fall.  (Am. Compl. ¶ 52.)  During the days following the fall, Brown experienced pain in his left shoulder, collarbone, and neck areas, and went to sick call on February 16, 17, 24, and 28, 2005, at which the medical staff prescribed analgesic balm and warm compresses, and scheduled an MRI of his hip.  (Am. Compl. ¶ 53 & Exs. B-10, B-11.)

On March 2, 2005, the medical staff reviewed Brown's "locking location" and determined that his current locking location was "acceptable [at] this time. If MRI abnormal, locking will be re-evaluat[ed]." (Am. Compl. Ex. B-11.)

On March 10, 2005, five days before Brown's permit for his walking cane was to expire, Brown's request for a renewal or extension of the permit was entered in his Ambulatory Health Record. (Am. Compl. ¶ 80 & Ex. D-1.) Brown later found out that someone wrote on the health record that Brown had "no need for cane." (Am. Compl. ¶ 84 & Ex. D-1.)

On March 8, 2005, Brown wrote a letter to Nurse Administrator Boyd, stating:

Yesterday 3/7/05 I went out on medical trip for an M.R.I. for my right hip. For some unknown reason the M.R.I. was not taken, I stayed shackled for approximately 13 hours and received no medical treatment. The pain in my hip is unbearable and I continue to suffer from the injuries. My bunions are very painful also.

When am I gonna have the surgeries that were recommended by the specialist? With these delays I suffer more each day. I'm in a great deal of pain Nurse Boyd, can you please make sure that I get these surgeries done.

(Am. Compl. ¶ 64 & Ex. C-2.)

In March 2005, Brown learned that other inmates with medical conditions similar to his were provided with transportation from Woodburne to a correctional facility near Alice Hyde Hospital, driven the short distance to Alice Hyde Hospital to be treated with orthopedic surgical procedures, and returned to Woodburne. (Am. Compl. ¶ 65 & Ex. C-3.) After learning this, on March 9, 2005, Brown wrote a letter to Dr. Rubinovich at Hyde Hospital, stating:

It was a pleasure meeting you January 13th, 05. I was looking forward to having you do my surgery, on my feet and hip.

> I know we decided to begin with my feet but Doc my hip is killing me, it hurts real bad.  I can't take this pain no more.  "Feet or hip."
>
> Something must be done because I'm suffering, the medication I'm taking does not alleviate the pain.
>
> You said back in January you were gonna do the surgery soon.  What's taking so long?  Are you still gonna do my surgery?
>
> This delay is causing me to suffer each day, please let me know what you're gonna do Doc.

(Am. Compl. ¶ 66 & Ex. C-3a.)  Brown's pain and suffering was "'exasperated' by the unreasonable delay on part of the Defendant[s] . . . , taking apparently four (4) months, . . . as they 'shopped around' for a local surgeon."  (Am. Compl. ¶ 66.)

On March 17, 2005, Brown went to sick call to complain of pain in his hip and recurring headaches.  (Am. Compl. ¶ 81.)  During this visit, Brown made another request for his walking cane permit to be renewed or extended.  (Am. Compl. ¶ 81 & Ex. D-2.)

On March 18, 2005, Brown was moved to first floor housing.  (Am. Compl. ¶ 57.)

On March 22, 2005, Brown was taken from Woodburne to Albany Medical Center for an MRI on his right hip.  (Am. Compl. ¶ 82.)  Dr. Makram's preliminary report after the MRI stated:  "There is severe degenerative arthrosis of the right hip with marked joint space narrowing superiorly with complete loss of the articular cartilage, subchondral cyst formation, marrow edema, and moderate marginal osteophytosis arising from the femoral head."  (Am. Compl. ¶ 82 & Ex. D-3.)  Dr. Makram handwrote a note on the preliminary report that stated "[i]nmate doesn't want to take care of [right] hip now, wants to fix feet 1st."  (Am. Compl. ¶ 82 & Ex. D-3.)  Brown received a

copy of this preliminary report and wrote to Dr. Makram requesting the definition of a certain medical term used in the report, but Dr. Makram did not respond.  (Am. Compl. ¶ 82.)

On March 24, 2005, Brown was stopped in the corridor by a corrections officer who requested Brown's permit for the walking cane.  (Am. Compl. ¶ 83.)  Brown explained that his walking cane permit was in the process of being renewed, and the officer let Brown go with a "stern warning to produce authorization 'next time' or face disciplinary action for unauthorized use."  (Am. Compl. ¶ 83.)  On April 15, 2005 another corrections officer stopped Brown to ask him for his cane permit.  (Am. Compl. ¶ 85.)  Brown went to the IGRC to ask the IGRC Supervisor to investigate the matter regarding the permit renewal.  (Am. Compl. ¶ 85.)  When Brown found out that his permit had not been renewed or extended, he returned his cane to the medical unit to avoid disciplinary action.  (Am. Compl. ¶ 86.)  Brown submitted a grievance regarding the non-renewal of his cane permit.  (Am. Compl. ¶ 87 & Ex. D-4.)

On April 18, 2005, Brown went to sick call complaining about his right hip and feet, and requested that he be allowed to use a walking cane again.  (Am. Compl. ¶ 88.)  The nurse checked Brown's records and told him that Dr. Makram had discontinued the authorization for a cane, and made an entry in Brown's records regarding his request for a cane.  (Am. Compl. ¶ 88 & Ex. D-5.)

On April 22, 2005, Brown went to sick call complaining of pain in his right hip and feet and asked for a cane.  (Am. Compl. ¶ 89.)  Nurse DeFrank told Brown that Dr. Makram indicated that he could have the cane back.  (Am. Compl. ¶ 90.)  Before handing the cane to Brown,

Nurse Defrank "made a remark relating to the grievance complaint Plaintiff submitted regarding the cane." (Am. Compl. ¶ 90.)  Brown asked Nurse DeFrank for a permit for use of the cane, recounting his experiences of being stopped by corrections officers.  (Am. Compl. ¶ 91.)  Nurse DeFrank told Brown that there was not a permit in the medical folder and said "'either you take the cane, or you don't.'"  (Am. Compl. ¶ 92.)  Because Brown needed the cane, he took it and then "'immediately' wrote a letter to security requesting a permit for authorization to use the needed walking cane."  (Am. Compl. ¶ 92 & Ex. D-6a.)

On April 25, 2005, Nurse Administrator Boyd wrote a memo to the IGRC Supervisor, stating:  "The grievant's complaints have been investigated and found to be unsubstantiated.  On the grievant's medical record on 3/10/05 entry, MD wrote no need for cane & signed her name.  MD re-evaluated this request on 4/18/05 and okayed it . . . Inmate has permit for a cane at this time."  (Am. Compl. ¶ 93 & Ex. D-7.)  On April 26, 2005, the IGRC responded to Brown's grievance about the cane permit, stating that "[g]rievant's action requested has been met."  (Am. Compl. ¶ 98 & Ex. D-10.)  On May 2, 2005, the Superintendent responded to the grievance appeal, stating:  "The cane was issued by the Medical Department and a notation was made in grievant's medical folder.  A new permit was written and received by grievant."  (Am. Compl. ¶ 98 & Ex. D-11.)  On May 4, 2005, Brown appealed these decisions, stating that the cane and heating pad "should have never been taken away from grievant," and requesting a permanent permit for a cane and a heating pad.  (Am. Compl. ¶ 98 & Ex. D-12.)  On May 25, 2005, CORC upheld the determinations of the Superintendent and the IGRC.  (Am. Compl. ¶ 98 & Ex. D-13.)

On April 27, 2005, a form was signed by a physician and a security officer stating that Brown had permission to permanently lock on the first floor in a lower bunk, to permanently use a cane, and temporarily use a heating pad until September 30, 2005.  (Am. Compl. ¶ 96 & D-9.)

On April 29, 2005, Brown had "bunionectomy" surgery.  (Am. Compl. ¶ 113 & Ex. E-5.)

On June 20, 2005, Brown met with Dr. Makram, complaining of pain in his feet. (Am. Compl. ¶ 107.)  During this meeting, Brown inquired as to when he would get the referral to orthotics for medical boots.  (Am. Compl. ¶ 108.)  Dr. Makram told Brown that she did not make that referral and that he "'has no need'" for medical boots.  (Am. Compl. ¶ 108.)  Dr. Makram noted in Brown's medical file that Brown had requested special shoes but that the request was denied because of "lack of medical necessity in the middle of operations on both feet."  (Am. Compl. ¶ 109 & Ex. E-2.)  Brown claims that Dr. Makram "ignored Plaintiff's course of direction and told Plaintiff . . .[']You're getting surgery, what more do you want?  You're not getting any medical boots, so stop bothering me about it and deal with the pain.[']"  (Am. Compl. ¶ 110.)  During the next few days, Brown reviewed his medical files and noticed that someone had crossed out an entry from November 2, 2004 stating that Brown "needs other boots, will refer to orthotics if approved by RMD."  (Am. Compl. ¶ 111 & Ex. E-3.)

On June 24, 2005, Brown submitted a grievance over the crossed-off entry regarding special boots.  (Am. Compl. ¶ 112 & Ex. E-4.)

On July 6, 2005, Nurse Administrator Boyd responded to the grievance in a memo

to the IGRC, stating:

> The grievant's complaints have been investigated and found to be unsubstantiated.
>
> Grievant had a bunionectomy on 4/29/05.  He was seen by DR Makram on 6/20/05.
> He only had mild swelling over the area of his surgery.  Per FHSD inmate's request
> for medical boots was denied due to lack of medical necessity.  Dr Makram did not
> order boots for grievant on 11/2/04 as she requested an appointment for him to see
> the foot specialist.  Per podiatry consult 12/17/04, podiatrist "discussed treatment
> options including wide footwear, injection surgery/ patient refuses treatment other
> than surgery."  Grievant had the surgery (bunionectomy) and now has no medical
> need for medical boots.

(Am. Compl. ¶ 113 & Ex. E-5.)  On July 7, 2005, the IGRC responded to Brown's grievance, stating:

"The Committee finds, as per Nurse Administrator Boyd's response, that there is no need for medical

boots."  (Am. Compl. ¶ 114 & Ex. E-6.)  On July 20, 2005, the Superintendent denied Brown's

appeal, stating:  "Grievant's action(s) requested were addressed appropriately by Nurse Administrator

Boyd.  As she stated, grievant was submitted to see the foot specialist.  Treatment (surgical

procedure) was administered and alleviated the need for medical boots."  (Am. Compl. ¶ 115 & Ex.

E-7.)  On July 22, 2005, Brown appealed the Superintendent's decision to CORC.  (Am. Compl.

¶ 116 & Ex. E-8.)  On August 10, 2005, the CORC denied Brown's appeal, stating:

> Contrary to the grievant's assertions, CORC has not been presented with sufficient
> evidence to substantiate any malfeasance by the employee referenced in this
> complaint.
>
> CORC notes that the FHSD [Dr. Makram] crossed off an earlier entry in the
> grievant's [medical records] in front of him when she determined that a referral for
> surgical intervention was the best course of action to treat his symptoms instead.
> CORC also notes that, although the grievant is undergoing physical therapy and has

a referral for another surgical procedure pending, the FHSD has determined that there is no medical necessity for prescription boots indicated at this time.

(Am. Compl. ¶ 117 & Ex. E-9.)

On September 7, 2005, Brown submitted a grievance about the cancellation of his surgery by the orthopedist at Hyde Hospital.  (Am. Compl. ¶ 67 & Ex. C-4.)  The grievance noted that instead of being sent back to Dr. Rubinovich at Hyde Hospital, Brown was referred to Dr. Lentini, which caused a three month delay in his surgery.  (Am. Compl. ¶ 67 & Ex. C-4.)  On September 14, 2005, Nurse Administrator Boyd responded to Brown's grievance, stating:

> The grievant's complaints have been investigated and found to be unsubstantiated.
>
> Grievant was seen by DR Rubinovich 1/05.  Dr Rubinovich did not state the grievant's feet were em[]ergent in nature.  He stated "We will eventually get to his left foot."  Grievant had surgery on his right foot 7/13/05. He is currently attending PT for it & will have surgery on the left afterward.
>
> Regarding Action Requested:
>
> 1. Bunionectomy surgery can be performed by local Orthopedic Specialists.  This saves the grievant from excessive traveling to go to a hospital that the previous surgeon uses.  The facility has no control over where the grievant is scheduled.

(Am. Compl. ¶ 68 & Ex. C-5.)  Brown admits that the round trip distance between Woodburne and Hyde Hospital is approximately 625 miles, while the round trip distance between Woodburne and the local hospital in Albany where he eventually went for his surgery is approximately 180 miles. (Am. Compl. at ¶ 68 n.5.)

On September 14, 2005, Brown wrote a letter to defendant Dr. Lester Wright, DOCS' Associate Commissioner and Chief Medical Officer, "to complain about on going medical issues at

[Woodburne] and to voice Plaintiff's concerns for the needed meaningful access permit," i.e., a permit that would allow Brown to walk through the courtyard on his way to the Medical Unit instead of walking "the long way around."  (Am. Compl. ¶ 124 & Ex. F-1.)

On September 16, 2005, the IGRC responded to Brown's September 7, 2005 grievance, stating:

> The Committee finds that according to Nurse Administrator Boyd's response the scheduling of grievant's surgery is beyond the facility's control.  We advise grievant to obtain copies of his medical records pertaining to the surgeon's recommendations and notes in his Ambulatory Health Record referring to his bunionectomy surgery. Grievant will be better informed about the actions being taken by the medical department concerning his medical problems.

(Am. Compl. ¶ 69 & Ex. C-6.)

On September 18, 2005, Brown wrote to Dr. Makram, requesting a medical access permit "allowing use of the court yard when I must go for medication or to the Medical Unit.  Due to my disability the access permit is deemed necessary."  (Am. Compl. ¶ 125 & Ex. F-2.)  On September 22, 2005, Brown at sick call again requested a medical access permit.  (Am. Compl. ¶ 126.)  Dr. Makram denied Brown's request for a medical access permit because "bunions are not going to prevent him from walking."  (Am. Compl. ¶ 127 & Ex. F-3.)

On September 29, 2005, the Superintendent responded to Brown's grievance appeal regarding the cancellation of his bunion surgery, stating:

> The status of grievant's bunionectomy surgery is considered non-emergent by Dr. Rubinovich.  Surgery has not been cancelled, but do to nature of ailment it will be considered at a later date.  Per Nurse Administrator Boyd the right foot did have surgery in July 2005 and that the left foot would be done in the future.

Medical care is proper and ongoing.

(Am. Compl. ¶ 70 & Ex. C-7.)

On October 1, 2005, Brown appealed the Superintendent's decision "'specifically requesting' justifiable reasons and/or an explanation, as to why, Plaintiff was not temporarily moved to a facility near Alice Hyde Hospital in order to gain access to treatment from the orthopedic specialist, as was done for other inmate's 'similarly situated.'" (Am. Compl. ¶ 71 & Ex. C-8.) Brown only mentioned the problems with his left foot, which had not yet been operated on, but did not mention his hip. (Am. Compl. ¶ 71 & Ex. C-8.)

On October 2, 2005, Brown filed a formal grievance regarding the medical access (to the courtyard) permit denial. (Am. Compl. ¶ 128 & Ex. F-4.)

On October 5, 2005, Brown received a response to his September 14 letter from Pedro Diaz on behalf of Dr. Lester Wright, stating:

> The Division of Health Services has investigated your concern regarding your allegation that you are receiving inadequate health services at Woodburne Correctional Facility. A review of your medical records indicates that you have repeatedly expressed the desire to have your bunions addressed prior to having your hip addressed. Since your left foot surgery you have been back to the specialist for follow-up, you are scheduled for physical therapy and have been referred to the specialist for your right foot problem. You have been seen and evaluated by the facility physician, who has determined that you do not require a permit for access through the courtyard. You have been provided a feed-in-cell permit through December 2005. Your medical needs are apparently being addressed.

> You, also, allege that RNs DeFrank and Reddish are hostile towards you when you go to sick call. These health care staff have categorically denied your allegation and indicated that they have provided you with appropriate and necessary health care. Your allegations are unfounded.

> You are urged to consult with the health care staff using the existing sick call procedures.  I am certain they will make every effort to address your medical needs.

(Am. Compl. ¶ 129 & Ex. F-5.)

On October 11, 2005, Nurse Administrator Boyd wrote a memo in response to Brown's grievance about the courtyard access permit, stating:

> The grievant's complaints have been investigated and found to be unsubstantiated.
>
> Grievant saw Orthopedic specialist on 1/13/05.  Inmate told MD that he wants his feet taken care of first & that "He feels he can live with his hip right now."  Specialist gives recommendations not orders.  Grievant is locking on the first floor, has a feed in cell permit till 12/1/05 & is attending Physical Therapy.  Facility Health Services Director denied inmate's request for permit to access medical through court yard.
>
> Regarding Action Requested:
>
> Denied, no medical need at this time per Facility Health Services Director.

(Am. Compl. ¶ 130 & Ex. F-6.)  On October 12, 2005, the IGRC responded to Brown, stating: "[T]he Facility Health Services Director has sole responsibility for grievant's health care.  Hence, it is beyond the purview of this Committee to recommend a Court Yard permit.  Grievant should write Deputy Superintendent for Programs, Ms. J. King, to request reasonable accommodations for the Court Yard crosswalk."  (Am. Compl. ¶ 131 & Ex. F-7.)  On October 13, 2005, Brown wrote to Ms. King requesting a court yard permit.  (Am. Compl. ¶ 131 & Ex. F-8.)  On October 14, 2005, Ms. King responded, stating: "My office is not in a position to grant this request.  I will address your concerns to the Acting Deputy Superintendent for Security to inquire the possibility of obtaining such a permit."  (Am. Compl. ¶ 132 & Ex. F-9.)  On October 19, 2005, Captain and Acting Deputy Superintendent P.D. Early denied Brown's request, stating "Per Dr. Makram, a courtyard access

permit is not medically necessary.  As a result, your request is denied."  (Am. Compl. ¶ 133 & Ex. F-10.)  On October 24, the Superintendent responded to Brown's grievance appeal relating to the medical access permit, stating:  "Grievant's requested action for a medical courtyard permit is not accepted.  The Facility Health Services Director (FHSD) has denied the request and deemed it not warranted."  (Am. Compl. ¶ 134 & Ex. F-11.)  Brown appealed this decision to CORC.  (Am. Compl. ¶ 134 & Ex. F-11.)

On October 26, 2005, CORC responded to Brown's appeal, stating in part:  "CORC notes that the grievant's medical issues are being appropriately addressed.  He has had surgery on his right foot and is going out for physical therapy . . . CORC asserts that Coordinated Specialty Care determines which surgeon will be used based on availability and other factors."  (Am. Compl. ¶ 72 & Ex. C-9.)

On November 4, 2005, Brown received the final bunion surgery on his feet.  (Am. Compl. ¶ 26.)

On November 16, 2005, CORC unanimously denied Brown's request for a medical access permit.  (Am. Compl. ¶ 135 & Ex. F-12.)

Nevertheless, on December 15, 2005, Brown was issued a temporary pass (valid through June 30, 2006) that would allow him to pass through the F-wing on his way to the medical unit.  (Am. Compl. ¶ 136 & Ex. F-14.)

**2006 Medical Records**

On February 10, 2006, Dr. Rubinovich wrote a letter to Dr. Makram that stated in part:

> Mr. Brown is a 46 year old gentleman who presents with pain in his right hip. I followed him previously with a diagnosis of degenerative change in the right hip post slipped epiphysis as a child. Sherman [Brown] is getting more and more pain in his hip. He is having difficulties with activities of daily living especially going up and down stairs. He does get around using a cane at this time. He has had both of his bunions fixed previously by the podiatrist. His general health is otherwise good. He has recently started on medication for hypertension. Additionally, he is on Risperdal, Celexa, and one other mood altering medication.
>
> . . .
>
> I have had a long chat with Sherman [Brown] with regards to treatments. He feels that this time he would like to proceed with a hip arthroplasty. I have gone over risks, complications, and options with him and he agrees. I am going to get this organized for him as an inpatient at Rome Hospital. He will require 3 days of in house care and then be discharged back for rehabilitation. If we can get clearance from Department of Corrections I will get this scheduled for him.

(Am. Compl. Ex. B-12.)

**Brown's Claims and the Relief Sought**

Brown asserts that defendants: (1) were deliberately indifferent to his serious medical needs; (2) retaliated against him; (3) discriminated against him; (4) ignored risks to his health and safety; (5) intentionally submitted false official reports and/or tampered with medical records; (6) denied and/or unreasonably delayed medical treatment and specialty care recommendations; and (7) deprived him of a transporting medical service and a meaningful access permit that was afforded to other prisoners similarly situated. (Dkt. No. 3: Am. Compl. ¶ 4.)

Brown's Amended Complaint requested, <u>inter alia</u>, the following relief: (1) a preliminary or permanent injunction prohibiting defendants from retaliating against him; (2) an order that Brown be issued a "meaningful access permit" authorizing him to use alternative routes to get to the Medical Unit; (3) a declaratory judgment that Brown's rights were violated under the ADA and the Eighth and Fourteenth Amendments; and (4) compensatory and punitive damages for deliberate indifference to Brown's medical needs in the sum of $6,168,000.00.  (Dkt. No. 3: Am. Compl. at 31.)

**Defendants' Motion to Dismiss**

Defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (Dkt. No. 24: Defs. Notice of Motion at 2),  on the grounds that:  (1) the Court lacks subject matter jurisdiction over Brown's claims for injunctive relief because he is no longer incarcerated in any DOCS facility (Dkt. No. 25: Defs. Br. at 4-5); (2) the Court lacks subject matter jurisdiction over Brown's claims against defendants in their official capacities (Defs. Br. at 6); (3) Brown's claims fail because he did not suffer from a sufficiently serious medical condition (Defs. Br. at 6-9); (4) Brown fails to state a claim under the ADA or Rehabilitation Act (Defs. Br. 9-10); (5) Brown's claims against certain defendants fail for lack of their personal involvement (Defs. Br. at 10-14); and (6) defendants are entitled to qualified immunity (Defs. Br. at 14-16).

## ANALYSIS

## I.    THE STANDARD GOVERNING A MOTION TO DISMISS[1]

A district court should deny a Rule 12(b)(6) motion to dismiss "unless it appears to a certainty that a plaintiff can prove no set of facts entitling him to relief." IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1052 (2d Cir. 1993) (quoting Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774, 779 (2d Cir. 1984)), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994).[2]  A court must accept as true the facts alleged in the complaint and draw all reasonable

---

[1]    For additional decisions by this Judge discussing the standard governing a motion to dismiss in language substantially similar to that in this section of this Opinion, see, e.g., Zhang v. U.S. Citizenship & Immigration Serv., 05 Civ. 4086, 2005 WL 3046440 at *3-4 (S.D.N.Y. Nov. 8, 2005) (Peck, M.J.); Hseuh v. Bank of New York, 05 Civ. 5345, 2005 WL 2842069 at *2-3 (S.D.N.Y. Oct. 31, 2005) (Peck, M.J.); Brooks v. Von Lenthe, 05 Civ. 3655, 2005 WL 2679716 at *8-9 (S.D.N.Y. Oct. 21, 2005) (Peck, M.J.), report & rec. adopted, 2006 WL 177146 (S.D.N.Y. Jan. 24, 2006) (Berman, D.J.); Wong v. Health First, 04 Civ. 10061, 2005 WL 1676705 at *1-3 (S.D.N.Y. July 19, 2005) (Peck, M.J.), report & rec. adopted, 2006 WL 2457944 (S.D.N.Y. Aug. 23, 2006) (Batts, D.J.); Chase v. Czajka, 04 Civ. 8228, 2005 WL 668535 at *4-5 (S.D.N.Y. Mar. 23, 2005) (Peck, M.J.), report & rec. adopted, 2005 WL 1352983 (June 8, 2005) (Kaplan, D.J.); Amadasu v. Bronx Lebanon Hosp. Ctr., 03 Civ. 6450, 2005 WL 121746 at *3 (S.D.N.Y. Jan. 21, 2005) (Peck, M.J.), report & rec. adopted, 2005 WL 954916 (S.D.N.Y. Apr. 26, 2005) (Kaplan, D.J.); Doe v. Goord, 04 Civ. 0570, 2004 WL 2829876 at *5-6 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F. Supp. 1071, 1080-81 (S.D.N.Y. 1996) (Knapp, D.J. & Peck, M.J.); In re Towers Fin. Corp. Noteholders Litig., 93 Civ. 0180, 1995 WL 571888 at *11 (S.D.N.Y. Sept. 20, 1995) (Peck, M.J.), report & rec. adopted, 936 F. Supp. 126 (S.D.N.Y. 1996) (Knapp, D.J.).

[2]    Accord, e.g., Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004); Weinstein v. Albright, 261 F.3d 127, 131 (2d Cir. 2001); In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 69 (2d Cir.), cert. denied, 534 U.S. 1071, 122 S. Ct. 678 (2001); Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).

inferences in favor of the nonmoving party – here, the plaintiff.  Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).[3/]

  The "standards for dismissal under [Rule] 12(b)(6) and 12(b)(1) are substantively identical." Lerner v. Fleet Bank, N.A., 318 F.3d 113, 128 (2d Cir.), cert. denied, 540 U.S. 1012, 124 S. Ct. 532 (2003); see also, e.g., Moore v. PaineWebber, Inc., 189 F.3d 165, 169 n.3 (2d Cir. 1999); Bishop v. Porter, 02 Civ. 9542, 2003 WL 21032011 at *3 (S.D.N.Y. May 8, 2003); Tennant v. United States Bureau of Prisons, 02 CV 00558, 2003 WL 1740605 at *1 (D. Conn. Mar. 29, 2003).[4/]

  A Rule 12(b)(6) motion to dismiss challenges only the face of the pleading.  Thus, in deciding such a motion to dismiss, "the Court must limit its analysis to the four corners of the

---

[3/]  Accord, e.g., Freedom Holdings, Inc. v. Spitzer, 357 F.3d at 216; Weinstein v. Albright, 261 F.3d at 131; In re Scholastic Corp. Sec. Litig., 252 F.3d at 69.

[4/]  The only substantive difference is "that the party invoking the jurisdiction of the court has the burden of proof in a 12(b)(1) motion, in contrast to a 12(b)(6) motion, in which the defendant has the burden of proof."  Lerner v. Fleet Bank, N.A., 318 F.3d at 128 (citing Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir. 1994)); see also, e.g., Langella v. Bush, 306 F. Supp. 2d 459, 463 (S.D.N.Y. 2004) ("On a motion to dismiss pursuant to Rule 12(b)(1), plaintiff carries the burden of establishing that subject matter jurisdiction exists over his complaint."); Bishop v. Porter, 2003 WL 21032011 at *3.

  The other difference is that on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the Court "may refer to evidence outside the pleadings." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)); see also, e.g., Land v. Dollar, 330 U.S. 731, 735 n.4, 67 S. Ct. 1009, 1011 n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, the court may inquire, by affidavits or otherwise, into the facts as they exist."); Exchange Nat'l Bank v. Touche Ross & Co., 544 F.2d 1126, 1130-31 (2d Cir. 1976); Masters v. Wilhelmina Model Agency, Inc., 02 Civ. 4911, 2003 WL 145556 at *1 (S.D.N.Y. Jan. 17, 2003).

complaint." Vassilatos v. Ceram Tech Int'l Ltd., 92 Civ. 4574, 1993 WL 177780 at *5 (S.D.N.Y.

May 19, 1993) (citing Kopec v. Coughlin, 922 F.2d 152, 154-55 (2d Cir. 1991)).[5/]   The Court,

however, may consider documents attached to the complaint as an exhibit or incorporated in the

complaint by reference.  E.g., Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)

("Because this standard has been misinterpreted on occasion, we reiterate here that a plaintiff's

*reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite

to the court's consideration of the document on a dismissal motion; mere notice or possession is not

enough."); Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (citing Cortec Indus.,

Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991), cert. denied, 503 U.S. 960, 1125 S. Ct.

1561 (1992)); Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to

dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit

or any statements or documents incorporated in it by reference. . . ."); see also, e.g., Paulemon v.

---

[5/]     Accord, e.g., Faulkner v. Beer, --- F.3d ---, 2006 WL 2588014 at *2 (2d Cir. Sept. 8, 2006); Aniero Concrete Co. v. New York City Constr. Auth., 94 Civ. 3506, 2000 WL 863208 at *31 (S.D.N.Y. June 27, 2000); Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp., 97 Civ. 5499, 2000 WL 264295 at *12 (S.D.N.Y. Mar. 9, 2000) ("When reviewing the pleadings on a motion to dismiss pursuant to Rule 12(b)(6), a court looks only to the four corners of the complaint and evaluates the legal viability of the allegations contained therein.").

When additional materials are submitted to the Court for consideration with a 12(b)(6) motion, the Court must either exclude the additional materials and decide the motion based solely upon the complaint, or convert the motion to one for summary judgment under Fed. R. Civ. P. 56.  See Fed. R. Civ. P. 12(b); Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000); Fonte v.  Board of Managers of Cont'l Towers Condos, 848 F.2d 24, 25 (2d Cir. 1988).

Tobin, 30 F.3d 307, 308-09 (2d Cir. 1994); Brass v. American Film Tech., Inc., 987 F.2d 142, 150 (2d Cir. 1993).

"However, before materials outside the record may become the basis of a dismissal, several conditions must be met.  For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.  It must also be clear that there exists no material disputed issue of fact regarding the relevance of the document." Faulkner v. Beer, 2006 WL 2588014 at *3 (citations omitted).

In this case, the medical records and grievance documents that Brown attached to the amended complaint may be considered on the motion to dismiss, whether under Rule 12(b)(1) or 12(b)(6), subject to the Faulkner v. Beer proviso.  (See cases cited in the immediately prior paragraphs.)

The Court's role in deciding a motion to dismiss "'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Saunders v. Coughlin, 92 Civ. 4289, 1994 WL 88108 at *2 (S.D.N.Y. Mar. 15, 1994) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)); accord, e.g., Watson v. McGinnis, 964 F. Supp. 127, 130-31 (S.D.N.Y. 1997) (Kaplan, D.J. & Peck, M.J.).  "'[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Saunders v. Coughlin, 1994 WL 88108 at *2 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686 (1974)).  A Rule 12(b)(6) motion will be granted "'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with

the allegations.'" <u>Saunders</u> v. <u>Coughlin</u>, 1994 WL 88108 at *2 (quoting <u>Hishon</u> v. <u>King & Spalding</u>,

467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984)).

When reviewing a pro se complaint, the Court must use less stringent standards than

if the complaint had been drafted by counsel.  <u>See</u>, <u>e.g.</u>, <u>LaBounty</u> v. <u>Adler</u>, 933 F.2d 121, 123 (2d

Cir. 1991); <u>Watson</u> v. <u>McGinnis</u>, 964 F. Supp. at 131; <u>Saunders</u> v. <u>Coughlin</u>, 1994 WL 88108 at *2

(citing <u>Hughes</u> v. <u>Rowe</u>, 449 U.S. 5, 101 S. Ct. 173 (1980)).  However, "[d]ismissal under Rule

12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain

relief. . . . " 2 <u>Moore's Federal Practice</u> § 12.34[4][a], at 12-72.7 (2005).  Thus, the "'duty to liberally

construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.'"  <u>Id.</u>, § 12.34[1][b],

at 12-61; <u>see also</u>, <u>e.g.</u>, <u>Joyner</u> v. <u>Greiner</u>, 195 F. Supp. 2d 500, 503 (S.D.N.Y. 2002) (action

dismissed because pro se plaintiff "failed to allege the facts tending to establish" that defendants

violated his constitutional rights).

## II.    BROWN'S § 1983 CLAIMS FOR DAMAGES AGAINST THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES ARE DISMISSED ON ELEVENTH AMENDMENT GROUNDS

"'It is black letter law that a suit against a state official in his official capacity seeking

damages is barred by the Eleventh Amendment. . . . '"  <u>Freeman</u> v. <u>Strack</u>, 99 Civ. 9878, 2000 WL

1459782 at *1 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.) (quoting <u>Jackson</u> v. <u>Johnson</u>, 30 F. Supp. 2d

613, 618 (S.D.N.Y. 1998) (Kaplan, D.J. & Peck, M.J.) (& cases cited therein); <u>accord</u>, <u>e.g.</u>, <u>Dunn</u>

v. <u>Carrier</u>, 137 Fed. Appx. 387, 389 (2d Cir. 2005); <u>Ford</u> v. <u>Reynolds</u>, 316 F.3d 351, 354 (2d Cir.

2003); <u>Davis</u> v. <u>New York</u>, 316 F.3d 93, 101 (2d Cir. 2002) (second hand smoke case); <u>Denis</u> v.

N.Y.S. Dep't of Corr. Servs., 05 Civ. 4495, 2006 WL 217926 at *12 (S.D.N.Y. Jan. 30, 2006) (Peck,

M.J.), report & rec. adopted, 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); Johnson

v. Goord, 01 Civ. 9587, 2004 WL 2199500 at *4 (S.D.N.Y. Sept. 29, 2004) ("Employees of DOCS

and its facilities, when sued in their official capacities, have been held to be subject to the state's

Eleventh Amendment immunity.  Thus, to the extent that these plaintiffs assert section 1983 damage

claims against defendants in their official capacities, they are dismissed from this action.") (citations

omitted); Baker v. Welch, 03 Civ. 2267, 2003 WL 22901051 at *6 (S.D.N.Y. Dec. 10, 2003) (Peck,

M.J.); Walker v. Pataro, 99 Civ. 4607, 2002 WL 664040 at *5 (S.D.N.Y. Apr. 23, 2002) (Peck,

M.J.).

          Accordingly, Brown's § 1983 claims for damages against the individual defendants

in their official capacities are dismissed.  Brown's § 1983 claims against the individual defendants

in their official capacities for injunctive relief and in their individual capacities for damages, which

are not barred by the Eleventh Amendment, are addressed below.  See, e.g., Davis v. New York, 316

F.3d at 101-02 (Eighth Amendment deliberate indifference "claims for declaratory and injunctive

relief and damages against defendants, in their individual capacities" for exposure to ETS not barred

by Eleventh Amendment); Denis v. N.Y.S. Dep't of Corr. Servs., 05 Civ. 4495, 2006 WL 217926

at *12;  Johnson v. Goord, 2004 WL 2199500 at *4 ("The Eleventh Amendment does not bar the

claims against defendants in their official capacities for declaratory and injunctive relief.").

III.   **BROWN'S CLAIMS FOR INJUNCTIVE RELIEF ARE DISMISSED AS MOOT**

Because Brown is no longer incarcerated and under the supervision of any of the defendants, Brown's request for injunctive relief "[p]rohibiting the Defendant's from taking any form of retaliation (disciplinary, or otherwise), against Plaintiff," and ordering the defendants to "issue Plaintiff a meaningful access permit authorizing Plaintiff use of alternative routes to F-Wing & Medical Unit to accommodate Plaintiff's disability" (Dkt. No. 3: Am. Compl. at 31) are moot. "Because plaintiff is no longer incarcerated and under the supervision of any of the named defendants, . . . [Brown's] claims for injunctive relief are moot and the Court lacks jurisdiction to consider them." Gadson v. Goord, 96 Civ. 7544, 1997 WL 714878 at *3 (S.D.N.Y. Nov. 17, 1997) (Sotomayor, D.J.).[6/] Accordingly, the Court will review Brown's claims only to the extent they seek

---

[6/]   See also, e.g., Salahuddin v. Goord, No. 04-3470, --- F.3d ---, 2006 WL 3041934 at *3 (2d Cir. Oct. 27, 2006) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); Hill v. Zenk, 115 Fed. Appx. 97, 97 (2d Cir. 2004) ("Because [plaintiff] brought his action for relief against the warden of a facility in which he concedes he is no longer incarcerated, his petition for relief is moot."); Thompson v. Carter, 284 F.3d 411, 415-16 (2d Cir. 2002); Colman v. Goord, 2 Fed. Appx. 170, 171 (2d Cir. 2001); Smith v. Westchester County, No. 97-2371, 152 F.3d 920 (table), 1998 WL 433008 at *2 (2d Cir. May 20, 1998); Prins v. Coughlin, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); Mawhinney v. Henderson, 542 F.2d 1, 2 (2d Cir. 1976) ("In view of the fact that appellant is no longer incarcerated at Auburn, his request for an injunction restraining the officials at Auburn from violating his civil rights is moot."); Claudio v. Goord, 03 Civ. 1234, 2006 WL 2290822 at *7 (S.D.N.Y. Aug. 8, 2006) ("It is well settled in this Circuit that being transferred from a prison moots any actions for injunctive relief available at that prison."); Cain v. Jones, 05 Civ. 3914, 2006 WL 846722 at *2 (S.D.N.Y. Mar. 30, 2006); Kee v. Hasty, 01 Civ. 2123, 2004 WL 807071 at *7 (S.D.N.Y. Apr. 14, 2004) ("[A]n incarcerated plaintiff's transfer out of the prison facility at which the cause of action arose moots his claim against that facility,
(continued...)

damages against the defendants.

## IV.   LEGAL   STANDARDS   GOVERNING   §   1983   EIGHTH   AMENDMENT   DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS CLAIMS[7/]

        To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied

a constitutional or federal statutory right and that the deprivation occurred under color of state law.

See 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988).  "Section

1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the

---

[6/]      (...continued)
insofar as it seeks injunctive and declaratory relief."); Verley v. Goord, 02 Civ. 1182, 2004 WL 526740 at *9 (S.D.N.Y. Jan. 23, 2004); Moore v. Keane, 01 Civ. 1139, 2002 U.S. Dist. LEXIS 1439 at *1 (S.D.N.Y. Jan. 31, 2002) ("[P]laintiff's request for injunctive relief is now moot because he has been released from prison."); Courts v. Coombe, 95 Civ. 2350, 1996 WL 312357 at *2 (S.D.N.Y. June 11, 1996) ("The mere possibility that [plaintiff] may be returned to Woodburne at some point in the future does not present a sufficient case or controversy that the Court can presently adjudicate.").

[7/]      For additional decisions by this Judge discussing the governing standard in § 1983 deliberate medical indifference claims, in language substantially similar to that in this entire section of this Opinion, see, e.g., Denis v. N.Y.S. Dep't of Corr. Servs., 05 Civ. 4495, 2006 WL 217926 at *12-15 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); Doe v. Goord, 04 Civ. 0570, 2005 WL 3116413 at *10-13 (S.D.N.Y. Nov. 22, 2005) (Peck, M.J.); Dawkins v. Jones, 03 Civ. 0068, 2005 WL 196537 at *13-15 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); Doe v. Goord, 04 Civ. 0570, 2004 WL 2829876 at *12-13 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); Hall v. Perilli, 03 Civ. 4635, 2004 WL 1068045 at *4-7 (S.D.N.Y. May 13, 2004) (Peck, M.J.); Nelson v. Rodas, 01 Civ. 7887, 2002 WL 31075804 at *10-13 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.); Espinal v. Goord, 00 Civ. 2242, 2001 WL 476070 at *7-10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); Fulmore v. Mamis, 00 Civ. 2831, 2001 WL 417119 at *7-8 (S.D.N.Y. Apr. 23, 2001) (Peck, M.J.); Freeman v. Strack, 99 Civ. 9878, 2000 WL 1459782 at *5-6 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); Culp v. Koenigsmann, 99 Civ. 9557, 2000 WL 995495 at *6-7 (S.D.N.Y. July 19, 2000) (Peck, M.J.); Carbonell v. Goord, 99 Civ. 3208, 2000 WL 760751 at *5-6 (S.D.N.Y. June 13, 2000) (Peck, M.J.).

deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), cert. denied, 512 U.S. 1240, 114 S. Ct. 2749 (1994).

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials and conduct that offends "evolving standards of decency." E.g., Hudson v. McMillan, 503 U.S. 1, 5, 8, 112 S. Ct. 995, 998, 1000 (1992); Wilson v. Seiter, 501 U.S. 294, 297, 308, 111 S. Ct. 2321, 2323, 2329 (1991); Estelle v. Gamble, 429 U.S. 97, 102, 104-05, 97 S. Ct. 285, 290, 291 (1976); Gregg v. Georgia, 428 U.S. 153, 173, 96 S. Ct. 2909, 2925 (1976).

To establish an Eighth Amendment violation based on a claim that a prison official has placed an inmate's health in danger, the inmate must show that the prison official acted with "deliberate indifference" to the inmate's serious medical needs. E.g., Helling v. McKinney, 509 U.S. 25, 32, 113 S. Ct. 2475, 2480 (1993); Estelle v. Gamble, 429 U.S. at 104-05, 97 S. Ct. at 291.[8/]

As the Second Circuit has explained, "the deliberate indifference standard embodies both an objective and a subjective prong." Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).[9/] "Objectively, the alleged deprivation must be 'sufficiently serious.'" Hathaway v. Coughlin, 99 F.3d at 553; see, e.g., Hudson v. McMillian, 503 U.S. at 9, 112 S. Ct. at 1000 ("Because society does not

---

[8/]    See also, e.g., Salahuddin v. Goord, No. 04-3470, --- F.3d ---, 2006 WL 3041934 at *10 (2d Cir. Oct. 27, 2006); Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003); Selby v. Coombe, 17 Fed. Appx. 36, 37 (2d Cir. 2001) (citing Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)); Perkins v. Obey, 00 Civ. 1691, 2004 WL 238036 at *8 (S.D.N.Y. Feb. 10, 2004).

[9/]    Accord, e.g., Salahuddin v. Goord, 2006 WL 3041934 at *10-11; Smith v. Carpenter, 316 F.3d at 183; Selby v. Coombe, 17 Fed. Appx. at 37; Chance v. Armstrong, 143 F.3d at 702.

expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious'"); Smith v. Carpenter, 316 F.3d at 183-84 ("The objective "medical need' element measures the severity of the alleged deprivation . . .").[10/]   "'The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . . .'"  Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).   "[O]nly those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 2324 (1991) (citation omitted); see also, e.g., Dean v. Coughlin, 804 F.2d at 215 ("'[T]he essential test is one of medical necessity and not one simply of desirability.'").  Thus, Eighth Amendment protection is limited to "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'"  Chance v. Armstrong,  143 F.3d at 702;[11/] accord, e.g., Morales v. Mackalm, 278 F.3d 126, 132 (2d Cir. 2002); Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'").

---

[10/]    See also, e.g., Salahuddin v. Goord, 2006 WL 3041934 at *10; Selby v. Coombe, 17 Fed. Appx. at 37; Chance v. Armstrong, 143 F.3d at 702; Lumaj v. Williams, 03 Civ. 1849, 2004 WL 1207894 at *4 (S.D.N.Y. June 2, 2004);  Torres v. Mazzuca, 246 F. Supp. 2d 334, 339 (S.D.N.Y. 2003).

[11/]    The Second Circuit in Chance v. Armstrong identified several factors that are relevant in determining whether a serious medical condition exists, including "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  143 F. 3d at 702.

The Second Circuit recently reiterated that determining whether a deprivation is objectively serious entails two inquiries:

> Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, "prison officials who act reasonably [in response to an inmate health risk] cannot be found liable under the Cruel and Unusual Punishments Clause," and, conversely, failing "to take reasonable measures" in response to a medical condition can lead to liability.
>
> Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Thus although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

Salahuddin v. Goord, 2006 WL 3041934 at *10 (citations omitted).

"Subjectively, the charged official must act with a sufficiently culpable state of mind."

Hathaway v. Coughlin, 99 F.3d at 553; accord, e.g., Salahuddin v. Goord, 2006 WL 3041934 at *11;

Smith v. Carpenter, 316 F.3d at 184 ("[T]he subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind."); Selby v. Coombe,

17 Fed. Appx. at 37; Chance v. Armstrong, 143 F.3d at 702.  "The required state of mind, equivalent to criminal recklessness, is that the official '"knows of and disregards an excessive risk to inmate health or safety;  the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."'"  Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir. 1998) (quoting Hathaway v. Coughlin, 99 F.3d at 553 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994))).[12]

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison [officials or] guards in intentionally denying or delaying access to medical care."  Estelle v. Gamble, 429 U.S. at 104-05, 97 S. Ct. at 291 (fn. omitted); accord, e.g., Kaminsky v. Rosenblum, 929 F.2d 922, 926 (2d Cir. 1991) ("Cruel and unusual punishment may consist of prison officials delaying an inmate access to needed medical care.").[13]  However, an

---

[12]     See also, e.g., Salahuddin v. Goord, 2006 WL 3041934 at *11 ("Deliberate indifference is a mental state equivalent to subjective recklessness. . . . This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."); Smith v. Carpenter, 316 F.3d at 184; Selby v. Coombe, 17 Fed. Appx. at 37; Chance v. Armstrong, 143 F.3d at 702; LaBounty v. Coughlin, 137 F.3d 68, 72-73 (2d Cir. 1998) ("To succeed in showing deliberate indifference, [plaintiff] must show that the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing his health in danger.");  Lumaj v. Williams, 2004 WL 1207894 at *5.

[13]     See, e.g., Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994) (delay for more than two years in removing broken pins from prisoner's hip despite nearly seventy complaints of pain), cert. denied, 513 U.S. 1154, 115 S. Ct. 1108 (1995); Liscio v. Warren, 901 F.2d 274, 277 (2d Cir. 1990) (failure to provide medical attention to a delirious inmate for three days); Archer v. Dutcher, 733 F.2d 14, 15-17 (2d Cir. 1984) (denying summary judgment where plaintiff "identifie[d]  intentional efforts on the part of defendants to delay her access to medical care at a time [when] she was in extreme pain"); Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. (continued...)

"inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." Estelle v. Gamble, 429 U.S. at 105-06, 97 S. Ct. at 292; accord, e.g., Burton v. New York State Dep't of Corr., 93 Civ. 6028, 1994 WL 97164 at *2 (S.D.N.Y. March 21, 1994) (Sotomayor, D.J.).  "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not  state a valid claim . . . under the Eighth Amendment."  Estelle v. Gamble, 429 U.S. at 106, 97 S. Ct. at 292.[14]  As the Supreme Court has stated, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. at 106, 97 S. Ct. at 292; accord, e.g., Smith v. Carpenter, 316 F.3d a 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims,  nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); Hathaway v. Coughlin, 99 F.3d at 553; Burton v. New York State Dep't of Corr., 1994 WL 97164 at *2.

An act of malpractice will amount to deliberate indifference only if "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'"  Chance v. Armstrong, 143 F.3d at 703 (quoting Hathaway v. Coughlin, 99 F.3d at 553); Harrison v. Barkley, 219 F.3d at 139 ("We agree that the mere malpractice of medicine in prison does not amount to an Eighth Amendment

---

[13]      (...continued)
          1974).

[14]      Accord, e.g., Salahuddin v. Goord, 2006 WL 3041934 at *11; Hathaway v. Coughlin, 99
          F.3d at 553; Felipe v. New York State Dep't of Corr. Servs., No. 95-CV-1735, 1998 WL
          178803 at *3 (N.D.N.Y. Apr. 10, 1998) (Pooler, D.J.).

violation. . . . This principle may cover a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady. . . . [But] [c]onsciously disregarding an inmate's legitimate medical needs is not 'mere medical malpractice.'"); Hathaway v. Coughlin, 37 F.3d at 66 ("Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.").

"It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." Chance v. Armstrong, 143 F.3d at 703; accord, e.g., Hathaway v. Coughlin, 37 F.3d at 70 (Jacobs, C.J., dissenting) ("'We do not sit as a medical board of review. Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors.'"); Culp v. Koenigsmann, 2000 WL 995495 at *7 ("Mere disagreements with the quality of medical care, however, do not state an Eighth Amendment claim."); see also, e.g., Troy v. Kuhlmann, 96 Civ. 7190, 1999 WL 825622 at *6 (S.D.N.Y. Oct. 15, 1999) ("a prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim"); Brown v. Selwin, 250 F. Supp. 2d 299, 308 (S.D.N.Y. 1999) (citing cases), aff'd, 29 Fed. Appx. 762 (2d Cir. 2002); Negron v. Macomber, 95 Civ. 4151, 1999 WL 608777 at *6 (S.D.N.Y. Aug. 11,

1999); <u>Espinal</u> v. <u>Coughlin</u>, 98 Civ. 2579, 1999 WL 387435 at *3 (S.D.N.Y. June 14, 1999).[15/]

   "Just as the relevant 'medical need' can only be identified in relation to the specific

factual context of each case, the severity of the alleged denial of medical care should be analyzed

---

[15/]   Furthermore, a delay in medical treatment does not necessarily invoke the Eighth Amendment:

   Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, this Court has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a "life-threatening and fast-degenerating" condition for three days; or delayed major surgery for over two years. No such circumstances are present here. At no point was [plaintiff's] condition "fast-degenerating" or "life-threatening," and there is no indication that [defendant] delayed treatment in order to punish him. Moreover, any delay in treatment in this case does not rise to the egregious level identified in <u>Hathaway</u>. That [plaintiff] feels something more should have been done to treat his injuries is not a sufficient basis for a deliberate indifference claim.

  <u>Demata</u> v. <u>New York State Corr. Dep't of Health Servs.</u>, No. 99-0066, 198 F. 3d 233 (table), 1999 WL 753142 at *2 (2d Cir. Sept. 17, 1999) (citations omitted) (summary judgment for defendants where plaintiff complained of knee injury in February 1994 and surgery not performed until March 1997); <u>accord</u>, <u>e.g.</u>, <u>Smith</u> v. <u>Carpenter</u>, 316 F.3d at 185 ("When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged <u>delay or interruption</u> in treatment rather than the person's <u>underlying medical condition</u> alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim.") (emphasis in original); <u>Freeman</u> v. <u>Strack</u>, 2000 WL 1459782 at *9 (no Eighth Amendment claim against nurse who scheduled inmate with appendicitis requiring appendectomy for appointment two hours later rather than seeing inmate immediately where "[t]here was nothing in [the inmate]'s medical history which would have put [the nurse] on notice that [plaintiff] was suffering from the onset of appendicitis . . . and there is no evidence that [the officer] gave [the nurse] any reason to believe that there was an emergency on hand"); <u>Culp</u> v. <u>Koenigsmann</u>, 2000 WL 995495 at *7-8 (rejecting claim based on fact that one doctor recommended arthroscopic surgery for knee injury in April 1999, while another doctor concluded that surgery was not warranted until more conservative measures like physical therapy had been tried and failed).

with regard to all relevant facts and circumstances.  The absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue.  Indeed, in most cases the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."   Smith v. Carpenter, 316 F.3d at 187 (citations omitted).

A risk of future harm also is actionable under the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 33-36, 113 S. Ct. 2475, 2480-82 (1993) (exposure to second hand smoke); Warren v. Keane, 196 F.3d 330, 332-33 (2d Cir. 1999) (same).  Determining whether "conditions of confinement violate the Eighth Amendment requires "more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by the exposure to [the harmful condition].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  Helling v. McKinney, 509 U.S. at 36, 113 S. Ct. at 2482.  The threatened health problems must be "'sufficiently imminent' and 'sure or very likely to cause serious illness and needless suffering in the next week or month or year.'"  Atkins v. County of Orange, 372 F. Supp. 2d 377, 408 (S.D.N.Y. 2005).

**V.      BROWN'S § 1983 CLAIMS RELATING TO HIS BUNIONS ARE DISMISSED FOR
           FAILURE TO STATE A CLAIM FOR DELIBERATE INDIFFERENCE**

Brown has specified three deliberate indifference claims relating to his bunions:
(1) defendants unreasonably delayed referral for needed podiatry services (Dkt. No. 3: Am. Compl.
¶¶ 9-26); (2) defendants intentionally cancelled and unreasonably delayed his bunion surgery
because they prevented him from getting transport to Hyde Hospital (Am. Compl. ¶¶ 58-76); and
(3) defendants intentionally denied him a referral for prescription footwear (Am. Compl. ¶¶ 102-22).
None of these claims support a finding of deliberate indifference to his serious medical needs.

Brown's bunions are not a sufficiently serious medical issue as to warrant Eighth
Amendment protection under a deliberate indifference theory.   Unlike cases where injuries
demonstrate the requisite urgency leading to "death, degeneration or extreme pain," the case law
holds that prisoner complaints about bunions or other foot problems do not establish the objective
prong of the deliberate indifference standard.  See, e.g., Hernandez v. Goord, 02 Civ. 1704, 2006 WL
2109432 at *1, 5-6 (S.D.N.Y. July 28, 2006) (plaintiff's painful injured left foot diagnosed as
hammertoe with an overlap not severe enough for deliberate indifference claim); McKinnis v.
Williams, 00 Civ. 8357, 2001 WL 873078 at *3-4 (S.D.N.Y. Aug. 1, 2001) (painful toe injury did
not "rise to the level of 'serious medical need'"); Veloz v. New York, 35 F. Supp. 2d 305, 312
(S.D.N.Y. 1999) (plaintiff's  fracture, bone cyst and degenerative arthritis in feet not "sufficiently
serious" medical condition); Alston v. Howard, 925 F. Supp. 1034, 1040 (S.D.N.Y. 1996) (ankle
injury not sufficiently serious to establish a constitutional violation); Cole v. Scully, 93 Civ. 2066,
1995 WL 231250 at *1, 5-6 (S.D.N.Y. Apr. 18, 1995) (bunions and tender feet after bunion surgery

not a sufficiently serious medical condition).  Brown's bunions are therefore not sufficiently serious to establish a claim for deliberate indifference as a matter of law.

          Additionally, based on the medical records attached to the complaint, no reasonable jury could find that defendants were subjectively deliberately indifferent to Brown's needs.  Brown was examined and treated for his foot problems on numerous occasions by defendants.  DOCS' medical personnel ordered x-rays to be taken of Brown's feet, gave him non-prescription and prescription pain medication, referred him to a podiatrist, and arranged for bunion surgery to be performed on both of his feet, which, once healed, relieved any need Brown had for special footwear. (See pages 5-25 above.)  Brown does not deny that he has received all of this treatment, and appears to be complaining merely about the type of treatment he was receiving or the speed at which he was scheduled for specialist appointments and surgery.  See, e.g., Davidson v. Scully, 155 F. Supp. 2d 77, 83-84 (S.D.N.Y. 2001) (No subjective deliberate indifference to plaintiff's foot problems where "plaintiff was examined and treated . . . on numerous occasions by DOCS medical personnel as well as by outside orthopedic doctors to whom plaintiff was referred by DOCS."); Williams v. M.C.C. Inst., 97 Civ. 5352, 1999 WL 179604 at *9 (S.D.N.Y. Mar. 31, 1999) (No subjective deliberate indifference where plaintiff was examined for dental problems on eight separate occasions during one year and five different occasions the next year and was always given treatment when he sought it.), aff'd, 101 Fed. Appx. 862 (2d Cir. 2004); Keyes v. Strack, 95 Civ. 2367, 1997 WL 187368 at *4 (S.D.N.Y. Apr. 16, 1997) ("The record shows that defendants were not deliberately indifferent to [plaintiff's] medical needs.  The Fishkill medical staff made continual efforts to treat and care for

plaintiff," with thirty visits to the facility's clinic over an eleven month period.); Alston v. Howard, 925 F. Supp. at 1040 (No deliberate indifference where plaintiff "was afforded consistent, attentive surgical and therapeutic medical care on about a weekly basis in a comprehensive attempt to remedy the source of [plaintiff's] ankle pain."); Johnson v. Dep't of Corr., 92 Civ. 7716, 1995 WL 121295 at *3 (S.D.N.Y. Mar. 21, 1995) (No deliberate indifference where "[d]uring the nine month period that plaintiff was in DOC custody he was examined and treated on numerous occasions for his hip condition and a myriad of other ailments.").  As discussed on page 40 above, disagreement over or delays in treatment do not create a constitutional claim.  Because Brown has failed to adequately plead any constitutional deliberate indifference, objective or subjective, to his medical needs relating to his bunions, those claims relating to his bunions are dismissed.[16]

## VI.   DEFENDANTS' MOTION TO DISMISS IS DENIED AS TO BROWN'S ARTHRITIC HIP CONDITION § 1983 CLAIM

Brown has specified three § 1983 deliberate indifference claims relating to his arthritic hip condition: (1) that his requests for first floor housing were denied (Dkt. No. 3: Am. Compl. ¶¶ 27-57); (2) that he was denied a walking cane (Am. Compl. ¶¶ 77-101); and (3) that he was denied an access permit that would allow him to take an alternative route to the medical unit (Am. Compl. ¶¶ 123-137).  While defendants contend that they could not be found to have acted with deliberate indifference because Brown's hip condition was not a sufficiently serious medical condition, Brown's complaint adequately alleges that his hip condition was (objectively) very severe

---

[16]   Since the only claim against defendant Nurse Molloy relate to bunion treatment (see page 13 above), all claims against her are dismissed.

and that defendants (subjectively) acted with deliberate indifference with regard to that condition.

First, although there is an indication in Brown's medical records that he has had pain in his right hip since a bicycle accident thirty years ago (Am. Compl. Ex. B-1), and notations from his doctors suggesting that Brown told them that "[h]e feels he can live with his hip right now" (Am. Compl. ¶ 48 & Ex. B-7), Brown's complaint disputes the accuracy of certain of the DOCS' records about his hip that are attached as exhibits to his complaint (see Am. Compl. ¶¶ 4, 19, 40 n.3, 47, 95-97, 100, 118, 120).  The Court therefore cannot fully accept all of the exhibits to Brown's complaint as true in considering the dismissal of these claims.  See Faulkner v. Beer, --- F.3d ---, No. 05-1568-CV, 2006 WL 2588014 at *3 (2d Cir. Sept. 8, 2006).  As a result, the medical evidence regarding Brown's arthritic hip in the exhibits attached to Brown's complaint are unclear as to the exact severity of his condition.

Additionally, Brown's complaint demonstrates that he was living with a great deal of pain in his hip for several months during 2004 and 2005, particularly after his fall down the stairs on February 15, 2005 (Am. Compl. ¶¶ 51-53).  Between August 27, 2004, when DOCS medical personnel first diagnosed the arthritis in his hip (Am. Compl. ¶ 27 & Ex. B-1), and December 15, 2005, when Brown was issued a medical access permit (Am. Compl. ¶ 136 & Ex. F-14), Brown complained about severe pain in his hip at least thirteen times (Am. Compl. ¶¶ 27, 28, 43, 44, 51-53, 64, 78, 81, 88, 89, 124-26).  Brown alleges that he informed defendants that pain in his hip was particularly acute when he was walking or climbing stairs. (Am. Compl. ¶¶ 28-31, 43, 44, 51-53, 78.)  Therefore, Brown's complaint adequately alleges that his arthritic hip condition was sufficiently

serious to satisfy the objective prong of a deliberate indifference inquiry.  See, e.g., Hathaway v.

Coughlin, 37 F.3d 63, 67 (2d Cir. 1994) (degenerative hip condition prior to surgery and broken pins

in hip after surgery, was sufficiently serious medical condition); Rhames v. Fed. Bureau of Prisons,

00 Civ. 4338, 2002 WL 1268005 at *6 (S.D.N.Y. June 6, 2002) (Plaintiff's "arthritic hip" was a

"serious medical condition[] that demanded attention"); Woods v. Goord, 01 Civ. 3255, 2002 WL

731691 at *4 (S.D.N.Y. Apr. 23, 2002) (plaintiff's leukemia, degenerative joint disease, and

rheumatoid arthritis were conceded to be sufficiently serious medical conditions).

Brown also has adequately alleged subjective deliberate indifference on defendants'

part.  Brown's complaint specifies that, knowing that Brown's arthritic hip condition caused him

severe pain when walking and climbing stairs, defendants Nurse DeFrank, Nurse Administrator

Boyd, Dr. Makram, and Dr. Lancellotti refused to grant him first floor housing, which would have

eliminated Brown's need to climb stairs and therefore would have eased some of his hip pain.  (Am.

Compl. ¶¶ 27-57; see pages 7-15 above.)  Brown was without first floor housing for approximately

three and a half months after requesting it in November 2004, and was without first floor housing

for approximately one month after the fall down the stairs injured his hip further.  (Am. Compl.

¶¶ 27-57; see page 13 above.)  Brown's complaint also specifies that, knowing of his painful hip

condition, Nurse DeFrank, Nurse Administrator Boyd, and Dr. Makram did not allow Brown to have

a cane, which would have greatly reduced Brown's hip pain when walking, for approximately one

week, and allowed Brown's cane permit to lapse for approximately a month and a half, making

Brown subject to discipline if he were caught with the cane but without a permit.  (Am. Compl.

¶¶ 77-101; see page 16 above.) Lastly, Brown's complaint asserts that, knowing of his painful hip condition, Dr. Makram and Nurse Administrator Boyd denied his requests for a medical access permit allowing him to use a shorter route to the medical unit, thereby decreasing the amount of hip pain associated with walking. (Am. Compl. ¶¶ 123-37.) Brown was without a medical access permit for approximately three months after he initially requested it.  (Am. Compl. ¶¶ 123-37; see pages 20-24 above.) See Rhames v. Fed. Bureau of Prisons, 2002 WL 1268005 at *7 (dismissal denied where plaintiff needed a cane to ease the pressure on his degenerated hip, but no cane was provided); Brady v. Griffith, 95 Civ. 2364, 1998 WL 814630 at *3-4 (S.D.N.Y. Nov. 23, 1998) (summary judgment denied where facts tended to show that defendants deprived plaintiff of wheelchair even though plaintiff needed wheelchair to get around and to transport herself to the medical unit for treatment). Brown has stated a claim for deliberate indifference to his medical needs with regard to his arthritic hip condition against defendants Nurse DeFrank, Nurse Administrator Boyd, Dr. Makram and Dr. Lancellotti, and therefore these defendants' motion to dismiss Brown's claims relating to his hip are denied.

## VII.   THE COURT DENIES THE MOTION OF SUPERVISORY DEFENDANTS EARLY, KING, CUNNINGHAM, DIAZ AND WRIGHT TO DISMISS DUE TO ALLEGED LACK OF PERSONAL INVOLVEMENT

### A.   Legal Standard[17/]

---

[17/]   For additional decisions authored by this Judge discussing the supervisory liability standard for § 1983 claims in language substantially similar to that in this entire section of this Opinion, see, e.g., Dawkins v. Jones, 03 Civ. 0068, 2005 WL 196537 at *10-11 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); Hall v. Perilli, 03 Civ. 4635, 2004 WL 1068045 at *9 (S.D.N.Y. (continued...)

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); accord, e.g., Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006); Gill v. Tuttle, 93 Fed. Appx. 301, 302 (2d Cir. 2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir. 2004); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003), cert. denied, 543 U.S. 1093, 125 S. Ct. 971 (2005); Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997); Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); Torres v. Mazzuca, 246 F. Supp. 2d 334, 338-39 (S.D.N.Y. 2003); Zamakshari v. Dvoskin, 899 F. Supp. 1097, 1109 (S.D.N.Y. 1995) (Sotomayor, D.J. & Peck, M.J.) ("In order to maintain a cause of action [under § 1983] against any official, a plaintiff must show that the defendant was personally involved in the alleged deprivation of his constitutional rights, since the doctrine of respondeat superior does not apply to § 1983 actions.").

"The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant,

---

17/      (...continued)
May 13, 2004) (Peck, M.J.); Muhammad v. Pico, 02 Civ. 1052, 2003 WL 21792158 at *16 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); Walker v. Pataro, 99 Civ. 4607, 2002 WL 664040 at *10 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.);  Espinal v. Goord, 00 Civ. 2242, 2001 WL 476070 at *10 (S.D.N.Y. May 7, 2001) (Peck, M.J.); Fulmore v. Mamis, 00 Civ. 2831, 2001 WL 417119 at *8 (S.D.N.Y. Apr. 3, 2001) (Peck, M.J.) (& cases cited therein); Freeman v. Strack, 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.); Djonbalic v. City of New York, 99 Civ. 11398, 2000 WL 1146631 at *11 (S.D.N.Y., Aug 14, 2000) (Peck, M.J.); Carbonell v. Goord, 99 Civ. 3208, 2000 WL 760751 at *6 (S.D.N.Y. June 13, 2000) (Peck, M.J.); Ali v. Szabo, 81 F. Supp. 2d 447, 462 (S.D.N.Y. 2000) (Pauley, D.J. & Peck, M.J.).

after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the

defendant created a policy or custom under which unconstitutional practices occurred, or allowed

the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising

subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference

to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring."  Colon v. Coughlin, 58 F.3d at 873.[18/]

### B.      Application of the Legal Standards to The "Supervisory Defendants"

While the "supervisory defendants" may prevail on summary judgment, the Court

cannot say on a motion to dismiss that plaintiff Brown can prove no facts as to his arthritic hip

entitling him to relief against the "supervisory defendants."  Dr. Wright is DOCS' Chief Medical

Officer, and plaintiff may be able to prove that Dr. Wright failed to remedy the (alleged) wrongs in

Brown's medical treatment, or that Dr. Wright created the medical policies at issue, or was grossly

negligent in supervising the prison medical staff.   Similarly, while defendant Diaz's only

involvement appears to be responding to Brown on behalf of Dr. Wright (see pages 22-23 above),

the Court cannot say that there is no set of facts Brown can prove to show Diaz's involvement and

liability.  Defendants King and Early were involved in denial of Brown's request for a courtyard

----

[18/]      Accord, e.g., Samuels v. Selsky, 166 Fed. Appx. 552, 556 (2d Cir. 2006); Patterson v. County of Oneida, 375 F.3d 206, 229 (2d Cir. 2004); Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 127 (2d Cir. 2004); Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003); Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); cert. denied, 543 U.S. 1093, 125 S. Ct. 971 (2005); Wright v. Smith, 21 F.3d at 501; Torres v. Mazzuca, 246 F. Supp. 2d at 339; Zamakshari v. Dvoskin, 899 F. Supp. at 1109; see also, e.g., Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002).

permit, and thus they effectively were directly involved in that aspect of Brown's hip claim.  (See pages 23-24 above.)  Supt. Cunningham denied all of Brown's grievances, and thus may prove to have failed to remedy wrongs or failed to adequately supervise subordinates.  See, e.g., McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004) (Prison officials who allegedly participated in denial of crucial medical treatment and rejected prisoner's administrative grievance were not entitled to qualified immunity at motion to dismiss stage from prisoner's claim of deliberate indifference to medical needs.); Smart v. Goord, 441 F. Supp. 2d 631, 643-44 (S.D.N.Y. 2006) (denying motion to dismiss on basis of qualified immunity; prisoner successfully alleged supevisory personnel's personal involvement in the violation of her due process rights by alleging, inter alia, Superintendent's failure to release prisoner from involuntary protective custody); James v. Aidala, 389 F. Supp. 2d 451, 452-53 (W.D.N.Y. 2005) (motion to dismiss on qualified immunity grounds denied where prisoner stated claim of personal involvement of Commissioner where prisoner alleged that Commissioner created and upheld unconstitutional policy and failed to provide adequate training and supervision to corrections employees).

## VIII.   BROWN HAS FAILED TO ALLEGE FACTS DEMONSTRATING RETALIATION UNDER SECTION 1983

### A.      Legal Standard Governing a § 1983 Retaliation Claim[19]/

---

[19]/      For additional decisions authored by this Judge discussing the plaintiff's burden of proof for a § 1983 retaliation claim in language substantially similar to that in this entire section of this Opinion, see, e.g., Dawkins v. Jones, 03 Civ. 0068, 2005 WL 196537 at *11-12 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); Walker v. Pataro, 99 Civ. 4607, 2002 WL 664040 at *8 (S.D.N.Y. Apr. 23, 2002) (Peck, M.J.).

The Second Circuit has clearly set forth a plaintiff's burden of proof in proving a § 1983 retaliation claim, as follows:

> The plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. If the plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff "even in the absence of the protected conduct." Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.

Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).[20]

A number of factors can be considered in determining whether a causal connection exists between the plaintiff's protected activity and the prison official's actions, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." Williams v. Muller, 2001 WL 936297 at *3 (citing Colon v. Coughlin, 58 F.3d 865, 872-73 (2d Cir. 1995)); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002); Gill v. Jones, 95 Civ. 9031, 2001 WL 1346012 at *6 (S.D.N.Y.

---

[20]    See, e.g., Gill v. Tuttle, 93 Fed. Appx. 301, 303 (2d Cir. 2004); Bennett v. Goord, 343 F.3d 133, 137 (2d. Cir. 2003); Ebron v. CTO Huria, No. 99-0087, 205 F.3d 1322 (table), 2000 WL 241576 at *1 (2d Cir. Feb. 1, 2000); Davidson v. Chestnut, 193 F.3d 144, 148-49 (2d Cir.1999); Duamutef v. Hollins, No. 97-2692, 159 F.3d 1346 (table), 1998 WL 537838 at *1 (2d Cir. July 7, 1998); Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir.), cert. denied, 525 U.S. 907, 119 S. Ct. 246 (1998); Davidson v. Kelly, No. 96-2066, 131 F.3d 130 (table), 1997 WL 738109 at *3 (2d Cir. Nov. 24, 1997); Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994); Sher v. Coughlin, 739 F.2d 77, 82 (2d Cir. 1984); see also, e.g., Walker v. Keyser, 98 Civ. 5217, 2001 WL 1160588 at *6 (S.D.N.Y. Oct. 2, 2001), aff'd, 131 Fed. Appx. 775 (2d Cir. 2005); Williams v. Muller, 98 Civ. 5204, 2001 WL 936297 at *3 (S.D.N.Y. Aug. 17, 2001); Jackson v. Johnson, 15 F. Supp. 2d 341, 363-64 (S.D.N.Y. 1998) (Kaplan, D.J. & Peck, M.J.); Campbell v. Kuhlmann, 91 Civ. 6766, 1998 WL 249196 at *4 (S.D.N.Y. May 15,1998).

Nov. 1, 2001); <u>Walker</u> v. <u>Keyser</u>, 2001 WL 1160588 at *6; <u>Rivera</u> v. <u>Goord</u>, 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000).

"While . . . the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim.  Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.  Otherwise, the retaliatory act is simply <u>de</u> <u>minimis</u>, and therefore outside the ambit of constitutional protection."  <u>Dawes</u> v. <u>Walker</u>, 239 F.3d 489, 492-93 (2d Cir. 2001) (citations omitted); <u>accord</u>, <u>e.g.</u>, <u>Morales</u> v. <u>Mackalm</u>, 278 F.3d at 131; <u>Davidson</u> v. <u>Chestnut</u>, 193 F.3d 144, 150 (2d Cir. 1999); <u>Thaddeus-X</u> v. <u>Blatter</u>, 175 F.3d 378, 396-98 (6th Cir. 1999) (to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment); <u>Crawford-El</u> v. <u>Britton</u>, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc), <u>rev'd on other grounds,</u> 523 U.S. 574, 118 S. Ct. 1584 (1998).[21/]

Prisoners' claims of retaliation, of course, must be examined with skepticism and particular care because they are "'prone to abuse' since prisoners can claim retaliation for every decision  they dislike."  <u>Graham</u> v. <u>Henderson</u>, 89 F.3d at 79 (quoting  <u>Flaherty</u> v. <u>Coughlin</u>, 713

---

[21/]    <u>See also</u>, <u>e.g.</u>, <u>Walker</u> v. <u>Keyser</u>, 2001 WL 1160588 at *6; <u>Wagnoon</u> v. <u>Gatson</u>, 00 Civ. 3722 & 99 Civ. 5872, 2001 WL 709276 at *6 (S.D.N.Y. June 25, 2001); <u>Rivera</u> v. <u>Goord</u>, 119 F. Supp. 2d at 340.

F.2d 10, 13 (2d Cir. 1983)); accord, e.g., Dawes v. Walker, 239 F.3d at 491; Colon v. Coughlin 58

F.3d at 872; Jackson v. Johnson, 15 F. Supp. 2d at 364 (& cases cited therein).

    **B.**    **Application to Brown's Retaliation Allegations**

    Brown's amended complaint asserts that defendant Nurse DeFrank retaliated against

him after he filed a grievance relating to her treatment of his bunions.  (Dkt. No. 3: Am. Compl. ¶¶ 4,

32-37.)  However, Brown has failed to allege any retaliatory acts sufficiently serious to rise to a

constitutional violation, i.e., acts that would deter a prisoner of ordinary firmness from exercising

constitutional rights.   Indeed, Brown himself was not deterred, because he filed several more

grievances against DOCS' staff, including Nurse DeFrank, after the alleged retaliation.  (See pages

8-24 above.)  Brown's § 1983 retaliation claim is dismissed.

**IX.**    **BROWN'S CLAIMS UNDER THE ADA AND REHABILITATION ACT**

    **A.**    **Brown's ADA and Rehabilitation Act Claims for Damages Against the Individual Defendants In Their Individual Capacity Are Dismissed**

    Damage claims against state officials in their individual capacities brought under the

ADA and the Rehabilitation Act are not actionable.  Garcia v. S.U.N.Y. Health Sciences Ctr., 280

F.3d 98, 107 (2d Cir. 2001); accord, e.g., Doe v. Goord, 04 Civ. 0570, 2004 WL 2829876 at *15

(S.D.N.Y. Dec. 10, 2004) (Peck, M.J.).  "Insofar as [plaintiff] is suing the individual defendants in

their individual capacities, neither Title II of the ADA, nor § 504 of the Rehabilitation Act provides

for individual capacity suits against state officials."  Garcia v. S.U.N.Y. Health Sciences Ctr., 280

F.3d at 107 (citing cases); accord, e.g., Doe v. Goord, 2004 WL 2829876 at *15.  Accordingly,

Brown's ADA and Rehabilitation Act damage claims against the individual defendants in their individual capacities are dismissed.

"Insofar as [plaintiff] is suing the individual defendants in their official capacities, he is seeking damages from New York, and the Eleventh Amendment therefore shields them to the same extent it shields [the State or State agencies]."  Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d at 107; Doe v. Goord, 2004 WL 2829876 at *15.  The Court therefore turns in the next sub-sections to the availability of ADA and Rehabilitation Act claims against the State under the Eleventh Amendment.

**B.    Brown's ADA Damage Claims Against the Individual Defendants In Their Official Capacity Are Not Barred By the Eleventh Amendment**

"[I]nsofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."  United States v. Georgia, 546 U.S. 151, 126 S. Ct. 877, 882 (2006) (emphasis in original).

A damage claim under the ADA against a state (or state agency or official) that covers conduct that violates the Fourteenth Amendment is not barred by the Eleventh Amendment as long as the "plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability." Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d 98, 112 (2d Cir. 2001); accord, e.g., Doe v. Goord, 04 Civ. 0570, 2004 WL 2829876 at *15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.).  The Second Circuit, in Garcia, recognized that "direct proof of this will often be lacking:  smoking guns are rarely left in plain view,"  and that plaintiffs may establish

"discriminatory animus" by relying on a "burden-shifting technique similar to that adopted in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), or a motivating-factor analysis similar to that set out in Price Waterhouse v. Hopkins, 490 U.S. 228, 252-58, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)."  Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d at 112; accord, e.g., Doe v. Goord, 2004 WL 2829876 at *15.

> ### C.    Doe's Rehabilitation Act Damage Claims Against the Individual Defendants In Their Official Capacity Are Not Barred By The Eleventh Amendment

Congress enacted Section 504 of the Rehabilitation Act pursuant to its authority under the Spending Clause of Article I of the Constitution.  See Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d 98, 113 (2d Cir. 2001).  When Congress provides federal funding, it may require that a state agree to waive its sovereign immunity as a condition of accepting the funds.  Id.  The Second Circuit in Garcia recognized that Congress expressly intended such a condition to apply for Section 504 of the Rehabilitation Act, Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d at 113 (citing 42 U.S.C. § 2000d-7), but ruled that a state may only effectively waive its sovereign immunity through an "'intentional relinquishment or abandonment of a known right or privilege.'"  Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d at 114 (quoting College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 682, 119 S. Ct. 2219, 2229 (1999)).  Garcia held that SUNY had not effectively waived its sovereign immunity because at the time it accepted federal funds, the Second Circuit had held that states did not have sovereign immunity under the essentially-similar provisions of the ADA.  Garcia v. S.U.N.Y. Health Sciences Ctr., 280 F.3d at 114 (citing Killcullen v. New York State Dep't of Labor, 205 F.3d 77, 82 (2d Cir. 2000) ("Congress has validly

abrogated the States' immunity from suit under both the ADA and Section 504 of the Rehabilitation Act."), overruled by Garcia v. S.U.N.Y. Health Sciences Ctr.

Since Garcia, state agencies in New York including DOCS have continued to accept federal funds and, therefore, waived immunity from suit under Section 504 of the Rehabilitation Act. (See cases cited immediately below.)  The district court decisions in this Circuit disagree as to whether New York effectively waived its sovereign immunity only by accepting federal funds after Garcia was decided, on September 25, 2001, or whether the waiver occurred as early as February 25, 2001, when the U.S. Supreme Court handed down its decision in Bd. of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955 (2001) (holding Title I of the ADA exceeded Congress' authority under § 5 of the Fourteenth Amendment and therefore suits against states were barred by the Eleventh Amendment).  Compare, e.g., Cardew v. New York State Dep't of Corr. Servs., 01 Civ. 3669, 2004 WL 943575 at *8 (S.D.N.Y. Apr. 30, 2004) (holding sovereign immunity waived as of the decision in Garrett); with Kilcullen v. New York State Dep't of Labor, No. 97-CV-484, 2003 WL 1220875 at *3 n. 1 (N.D.N.Y. Mar. 13, 2003) (collecting cases holding sovereign immunity waived as of Garcia); and with Wasser v. New York State Office of Vocational & Educ. Servs. for Individuals with Disabilities, No. 01-CV-6788, 2003 WL 22284576 at *10 (E.D.N.Y. Sept. 30, 2003) (dicta; finding an "arguable" basis that sovereign immunity may have been waived as of April 17, 2000, when the Supreme Court granted certiorari in Garrett).

This Court need not decide the exact date that sovereign immunity was effectively waived because Brown's claims arise out of conduct in 2004 through 2006, by which time New York

was clearly subject to suit under Section 504 of the Rehabilitation Act.  See, e.g., Doe v. Goord, 04

Civ. 0570, 2004 WL 2829876 at *15 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.).

**D.      The ADA and Rehabilitation Act Standards**

To prove a violation of Title II of the ADA,[22] a plaintiff must demonstrate:  "(1) that

he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public

entity's services, programs or activities or was otherwise discriminated against by a public entity; and

(3) that such exclusion or discrimination was due to his disability." Hargrave v. Vermont, 340 F.3d

27, 34-35 (2d Cir. 2003); Doe v. Goord, 04 Civ. 0570, 2004 WL 2829876 at *15 (S.D.N.Y. Dec. 10,

2004) (Peck, M.J.); K.M. v. Hyde Park Cent. Sch. Dist., 381 F. Supp. 2d 343, 357-58 (S.D.N.Y.

2005); Blatch v. Hernandez, 360 F. Supp. 2d 595, 629 (S.D.N.Y. 2005).  Since "[t]hese requirements

apply with equal force to plaintiffs' Rehabilitation Act claims," the Court will analyze the claims in

tandem.[23]  See Hargrave v. Vermont, 340 F.3d at 35; Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d

79, 85 (2d Cir. 2004) ("Since the standards adopted by Titles II and III of the ADA are, in most

cases, the same as those required under the Rehabilitation Act, . . . we consider the merits of these

claims together."); Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003) ("[U]nless one of

---

[22]      Title II of the ADA provides:  "no qualified individual with a disability shall, by reason of
such disability, be excluded from participation in or be denied the benefits of the services,
programs, or activities of a public entity, or be subjected to discrimination by any such
entity."  42 U.S.C. § 12132.

[23]      Section 504 of the Rehabilitation Act provides in pertinent part:  "No otherwise qualified
individual with a disability . . . shall, solely by reason of her or his disability, be excluded
from the participation in, be denied the benefits of, or be subjected to discrimination under
any program or activity receiving Federal financial assistance. . . ."  29 U.S.C. § 794(a).

those subtle distinctions [between the Rehabilitation Act and the ADA] is pertinent to a particular case, we treat claims under the two statutes identically."), cert. denied, 541 U.S. 936, 124 S. Ct. 1658 (2004); Doe v. Goord, 2004 WL 2829876 at *18; K.M. v. Hyde Park Cent. Sch. Dist., 381 F. Supp. 2d at 357; Blatch v. Hernandez, 360 F. Supp. 2d at 630.

> Pursuant to the ADA, a "qualified individual with a disability" means
>
> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

### E.   Application to Brown's Claims

Because Brown's Eighth Amendment claims relating to his bunions fail to state a claim for a deliberate indifference (see discussion at Point V above), those claims similarly fail under the ADA and Rehabilitation Act.  Defendants' motion to dismiss Brown's ADA and Rehabilitation Act claims relating to his bunions is therefore GRANTED.

Because Brown's constitutional claims relating to his arthritic hip condition survive and the ADA and Rehabilitation Act claims relating to his arthritic hip condition do not expand the scope of discovery, it makes sense to let these claims proceed at this stage and revisit them after discovery via a summary judgment motion.  See Doe v. Goord, 04 Civ. 0570, 2004 2829876 at *7 n.13 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.) (denying defendant's motion to dismiss prisoner's ADA claims where decision on the motion would not affect scope of discovery); Metallia U.S.A. LLC, v. Stulpinas, 98 Civ. 3497, 1998 WL 1039103 at *2 n.3 (S.D.N.Y. Dec. 16, 1998) (Peck, M.J.) (citing

cases).  Defendants' motion to dismiss Brown's ADA and Rehabilitation Act claims relating to his arthritic hip condition is therefore DENIED.

## X.    DEFENDANTS' MOTION TO DISMISS ON QUALIFIED IMMUNITY GROUNDS IS DENIED

Defendants have raised the affirmative defense of qualified immunity because, they contend, their actions were objectively reasonable and did not violate any clearly established rights. (Dkt. No. 25: Defs. Br. at 14-16.)

A Rule 12(b)(6) motion to dismiss is usually not the appropriate pleading in which to raise an affirmative defense.  See, e.g., McKenna v. Wright, 386 F.3d 432, 435 (2d Cir. 2004). However, the Second Circuit has recently recognized a caveat to this general rule; "we see no reason why even a traditional qualified immunity defense may not be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint." McKenna v. Wright, 386 F.3d at 436.

The right to be free from deliberate indifference to serious medical needs is well established and was at the time of defendants' conduct.  The issue thus is whether defendants' actions (or failure to act) with respect to Brown's hip condition were subjectively unreasonable so as to constitute deliberate indifference.  The Court cannot say on a motion to dismiss that any defendant's actions were so clear as to entitle them to dismissal on qualified immunity grounds at this stage of the case.  Defendants' motion to dismiss on qualified immunity grounds is denied.  See, e.g., Field Day, LLC v. County of Suffolk, 463 F.3d 167, 195 (2d Cir. 2006) (County officials did not demonstrate an entitlement to qualified immunity at the motion to dismiss stage.); Golio v. City of

White Plains, --- F. Supp. 3d ---, 2006 WL 3199140 at *3 (S.D.N.Y. Nov. 2, 2006); Roper v. Hynes,

05 Civ. 7664, 2006 WL 2773032 at *6 (S.D.N.Y. Sept. 27, 2006); see also cases cited on page 51

above.

## CONCLUSION

For the reasons discussed above, defendants' motion to dismiss is GRANTED with

respect to (1) Brown's claims under § 1983 against defendants in their official capacity; (2) all of

Brown's claims for injunctive relief; (3) Brown's § 1983 deliberate indifference to medical needs

claims relating to his bunions; (4) Brown's § 1983 retaliation claims; and (5) Brown's ADA and

Rehabilitation Act claims relating to his bunions.  Defendants' motion to dismiss is DENIED with

respect to (1) Brown's § 1983 deliberate indifference to medical needs claims relating to his arthritic

hip condition; (2) Brown's ADA and Rehabilitation Act claims relating to his arthritic hip condition;

and (3) defendants' claim of qualified immunity.


DATED:      New York, New York
            November 15, 2006


                                        Respectfully submitted,


                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge

Copies to:   Sherman Brown (Regular & Certified Mail)
             Daniel A. Schulze, Esq.


H:\OPIN\BROWNvDEFRANK